**S.H.R., Appellant,**

**v.**

**DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES,**
**Appellee.**

**No. 01–10–00999–CV.**

Court of Appeals of Texas,
Houston (1st Dist.).

April 20, 2012.

Supplemental Opinion on Rehearing
June 14, 2012.

William Michael Thursland, Houston, TX, for Appellant.

Michelle Walker Emmo Bush, Sandra D. Hachem, Sr. Assistant County Attorney, Dan Jeffrey Spjut, Houston, TX, for Appellee.

Panel consists of Justices JENNINGS, SHARP, and BROWN.

## OPINION

JIM SHARP, Justice.

Appellant S.H.R.'s parental rights to his three minor children were terminated after a bench trial. In three issues, appellant contends that the evidence was legally and factually insufficient to support: (1) termination under Family Code section 161.001(1)(D) (that he knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children); (2) termination under Family Code section 161.001(1)(E) (that he engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children); and (3) a finding that termination is in the best interest of the children. *See* TEX. FAM.CODE ANN. § 161.001(1)(D), (E) (West Supp. 2011). We conclude that while the evidence is legally sufficient, it is nonetheless factually insufficient, and we reverse.

## Background

In a joint trial, the Department of Family and Protective Services (DFPS) sought to terminate the parental rights of both the biological mother and appellant as to their three daughters S.M.R., G.J.R., and C.N.R. Although the record is somewhat unclear on certain dates, the following is a reasonable chronology of the key events discussed at trial concerning appellant:

| | |
|---|---|
| July 1992 | Appellant's conviction for possession of cocaine |
| July 1998 | Appellant's misdemeanor probation for DWI |
| December 2003 | S.M.R. born |
| October 2004 | Appellant's misdemeanor conviction of terroristic threat involving mother |
| May 2005 | G.J.R. born |
| January 2006 | C.N.R. born |
| Sometime in 2007 | Appellant and mother separate; children apparently go to live with mother |

| | |
|---|---|
| January 2008 | Appellant's misdemeanor conviction for interference with emergency telephone call involving mother |
| July 1, 2008 | Fire at Galveston residence where children lived with mother and Dustin Armstrong |
| June 2008 to September 2008 | Children go to live with appellant |
| September 2008 | Children go to live with their maternal aunt |
| September 21, 2008 | Mother signs letter giving custody of children to appellant |
| September 24, 2008 | Children go to live with appellant |
| December 22, 2008 | Appellant leaves children in care of maternal aunt when appellant voluntarily goes to jail for two weeks to work off Class C misdemeanor fine |
| December 29, 2008 | Appellant's misdemeanor conviction for criminal trespass |
| March 6, 2009 | Appellant's misdemeanor conviction for harassment threat to then-current girlfriend |
| May 7, 2009 | Children removed from custody of maternal aunt based on reports of neglectful supervision and medical neglect; DFPS appointed temporary managing conservator of children |
| June 30, 200 | S.M.R. and G.J.R. test positive for nonspecific type of herpes |
| July 3, 2009 | G.J.R.'s outcry to unspecified Child Protective Services employee that "her father showers with her" |
| July 16, 2009 | Claudia Mullin conducts forensic interview of G.J.R. at Harris County Children's Assessment Center; G.J.R. tells Mullin that (1) "Daddy and mommy bit me and licked me," pointing to her genitals and behind, (2) she saw a picture of "her mother and her father" "make it," (3) "her father" rubbed her genitals; and (4) "her father" urinated on the floor in front of her |
| August 10, 2009 | S.M.R. and G.J.R. test positive for oral herpes and negative for genital herpes; C.N.R. tests negative for genital herpes |
| October 19, 2009 | Children begin counseling sessions with Raquel Wade–Zeller, a licensed professional counselor, on weekly basis; children did not discuss sexual abuse during counseling; S.M.R. told Wade–Zeller about domestic violence between mother and "the father" or "daddy" |
| October 26, 2009 | Appellant tests positive for genital herpes |
| November 12, 2009 | Appellant informs DFPS caseworker of his herpes status; appellant discusses his concerns that children might be abused by man who lived with mother |
| December 8, 2009 | Foster care agency report stating mother has "moved to Alabama and [appellant] has been cleared of any charges related to sexual abuse of [the children]" |
| May 4 to June 8, 2010 | G.J.R.'s extended forensic evaluation conducted |
| September 14, 2010 | Trial begins |

Because this case turns on evidentiary sufficiency, we will discuss the trial at length.

*Exhibits*

DFPS first introduced exhibits, some of which were mentioned during the trial. Although no medical expert testified at trial (nor any objection made to the lack thereof), the following key medical records were admitted into evidence:

*S.M.R.'s records—*

- August 10, 2009 (age 6) tests positive for type 1 (oral) HSV and negative for type 2 (genital) HSV
- August 27, 2009 doctor office visit; doctor noted "HSV type 1 positive (oral type), HSV2 negative (genital type)," as documented by August 10, 2009 lab reports
- Earlier July 9, 2009 doctor office visit noted:

"Foster Mom took her in for a screening STD visit protocol of CPS and lab results revealed positive HVS 1/2 type nonspecific to both IGG and IGM." The doctor also wrote, "HSV 1 or 2 positive for nonspecific type assay IGG and IGM-need confirmatory type-specific IGG assay in 4 weeks."

No lab reports are attached to records for this July office visit, however, the records did include the following statement: "Lab corp (6/30/09) HIV negative, hep panel negative, GC/C negative, HSV 1/2 (non-type specific)/IGG and IGM positive titers, RPR–NR."

*G.J.R.'s records—*

- August 10, 2009 (age 4) tests positive for type 1 (oral) HSV and negative for type 2 (genital) HSV
- August 27, 2009 doctor office visit; doctor noted "HSV type 1 positive (oral type), HSV 2 negative (genital type)" as documented by August 10, 2009 lab reports
- Earlier July 9, 2009 doctor office visit noted, "4yo female here for evaluation due to positive HSV 1/2 IgG and IgM;" doctor also wrote, "type specific HSV 1 IGG and HCV 2 IGG needed in 4 weeks to determine exposure type"

*C.N.R.'s records—*

- August 10, 2009 (age 3) tests negative for HSV type 2 (genital)

*Appellant's records—*

- October 26, 2009 tests positive on for HSV type 2 (genital)

Appellant's prior criminal convictions were admitted into evidence.

- July 31, 1992 felony conviction for possession of cocaine with intent to deliver
- July 17, 1998 misdemeanor community supervision judgment for driving while intoxicated
- October 21, 2004 misdemeanor conviction of terroristic threat
- January 3, 2008 misdemeanor conviction for interference with an emergency telephone call
- December 29, 2008 misdemeanor conviction for criminal trespass
- March 6, 2009 misdemeanor conviction for harassment

The biological mother's psychological evaluation was also introduced into evidence, but it was never discussed at trial.

*The forensic interviewer*

DFPS's first witness was Claudia Mullin, a forensic interviewer with the Harris County Children's Assessment Center (CAC). The trial court accepted Mullin as an expert in forensic interviewing.

Mullin interviewed G.J.R., age 4, on July 16, 2009. The reason for the interview was because "they tested positive for herpes," an apparent reference to G.J.R. and S.M.R.'s June 30, 2009 test results which were nonspecific as to the either HSV type 1 or HSV type 2. The lab reports that specified that G.J.R. and S.M.R. tested positive for oral herpes and negative for genital herpes occurred one month later, on August 10, 2009. Mullin also interviewed S.M.R., but not C.N.R. as she was too young and nonverbal. Mullin also stated that G.J.R. and S.M.R. were referred to CAC because "they were bathing—that the father would bath with them" and "the children seemed to be afraid of males." Mullin was not told of any outcry that G.J.R. may have made.

G.J.R. told Mullin, "Daddy and mommy bit me and licked me," pointing to her genitals and behind. Using anatomical dolls, G.J.R. identified the genitals and behind. G.J.R. said she had seen "a pic-

ture of her mother and her father make it." G.J.R. also said that she had seen her grandpa "make it," called him "Yummy Grandpa," and talked about "eating his bottom and his coochie." Using anatomical dolls concerning grandpa, G.J.R. identified the genitals and behind.

G.J.R. told Mullin that "the father" rubbed her genitals and she described his genitalia as "red and green." She also said she was "[p]oked by a boat," but Mullin had no clarifying questions in her notes to explain what G.J.R. meant by that. G.J.R. also told Mullin that "her father" urinated on the floor in front of her and "sneaked" into the bathroom when she was in the bathroom.

On cross-examination by appellant's lawyer, Mullin said that she was aware that the children were not living with appellant at the time of the interviews, but she did not know if they were living with another man at the time. Mullin "could not say" to whom G.J.R. was referring when she used the term "daddy" or "father."

Appellant's lawyer questioned Mullin about a house fire and G.J.R.'s statement during the interview concerning that " 'daddy' pulled out his penis and peed on the fire." Appellant's lawyer offered into evidence a fire department report describing a fire that occurred in Galveston at a house where the children were living, but appellant was not. The lawyer asked Mullin "[w]ouldn't it have been smart to clarity who she was talking about when she's referring to 'daddy'?" Mullin responded, "I asked her in the beginning who her daddy was, and I cannot tell you because I did not write verbatim what name she answered." Mullin admitted that she could not accurately answer whether " 'daddy' was either the man that mommy was involved with or [appellant]."

Appellant's lawyer expanded the question to the entire forensic interview, "You never clarified in the interview with [G.J.R.] who she was speaking about when she used the word 'daddy'?" Mullin responded, "No." "You're not able to testify to this Court when [G.J.R.] referred to or used the word 'daddy,' whether or not she's referring to the man her mother was living with or [appellant]." Mullin responded, "Correct."

Q. So as a part of your interviewing technique, wouldn't it have been a good idea to establish who the child was talking about when she was referring to "daddy"?

A. Yes.

Q. And you failed to do that correct; correct?

A. Yes.

The trial court later acknowledged that "she said and she did testify that she did not ask who daddy was, so let's just go on. I think you've established that."

Appellant's lawyer asked Mullin about G.J.R.'s statement during another part of the interview:

Q. And then she said, "I was so mad he peed on my carpet, so I got my belt and he was whupping me—whupping him …" and then she said, "I got him out of his car …' " and then she said, "He pulled his clothes off and he was driving …" and then she said "I run and I try to get my dad's truck with my teeth and it pulled out of …" and that's what she said and you asked her, "He took his clothes off in his truck? What did you see?"

. . . .

Q. Okay. In your professional opinion, what does that mean?

. . . .

THE COURT: No, I think the question is: What does that mean? . . . .

[Mullin]: Whether or not he was naked and so I asked what she saw when he took his clothes off.

Q. [By appellant's lawyer] And who were you talking about?

A. The man she was calling "daddy."

Q. And we don't know who that is; correct?

A. Correct.

G.J.R. then described "daddy's" "privates" as "[r]ed and green" and described the shape by pointing to the vagina on an anatomical doll. Appellant's lawyer discussed G.J.R.'s statement about "Grandpa," focusing on G.J.R.'s use of the colors "red and green" to describe the shape of his genitalia.

On cross-examination, the ad litem for the children asked Mullin if she assumed that the people G.J.R. identified as mommy and daddy were the parents. She said she did not, but in this case Mullin believes that G.J.R. identified mommy and daddy as "[w]hoever she considers to be mommy and daddy." Both the ad litem and the trial court asked Mullin if, in her professional opinion, the children were sexually abused, and Mullin stated, "I don't have an opinion about that."

On redirect by DFPS, Mullin was asked if it as her job to determine whether or not sexual abuse had occurred and she said it was not. Mullin, however, did not retract her statement that she had no opinion about sexual abuse. As a result of her forensic interview, Mullin recommended an extended forensic evaluation of G.J.R. The statements that concerned her were "licking my bottom," seeing naked pictures, use of the word "coochie," and bringing up "yummy Grandpa."

*The forensic interviewer*

DFPS's second witness was Raquel Wade–Zeller, a licensed professional counselor, and the trial court accepted Wade–

Zeller as an expert. During therapy sessions, G.J.R. and C.N.R. referred to their foster mother as "mommy." S.M.R. referred to her father as "daddy," but she never called him by his actual name. Appellant's lawyer objected to the implication that "daddy" meant appellant, and the trial court overruled the objection stating, "I'm not sure that's the insinuation, just referring to 'daddy.'"

Wade–Zeller said she did not know that the mother had a boyfriend, did not get a specific name for the man S.M.R. referred to as "daddy," and did not explore the living arrangements the children had with the mother's boyfriend. The trial court later acknowledged that "it's clear that this witness has already stated on the record she doesn't know, she never got a name for who daddy was."

S.M.R. was the only child who communicated to Wade–Zeller that there was domestic violence between the biological mother and father. Wade–Zeller recommended that both biological parents' rights be terminated. The basis for her recommendation was that in order for the girls "to not have reactive attachment disorder that they need a stable home so they're not being dropped off with relatives. So that they can have good relationships to demonstrate good relations to them, who doesn't use physical punishment with them."

On cross-examination by appellant's lawyer, Wade–Zeller stated that nothing came up in her conversations with S.M.R., G.J.R., or C.N.R. about sexual abuse. Wade–Zeller said that when the children talked about their current foster mom, "they do not call her mom, they call her by name." The children also referred to their aunt as "my daddy's sister" or "my mommy's sister."

The ad litem asked Wade–Zeller "if children of these ages were to have sexually transmitted diseases, would that be an indicator of sexual abuse?" and she answered, "Yes." Wade–Zeller had no opinion as to whether the children were afraid of their parents.

On further cross-examination by appellant's lawyer, Wade–Zeller stated she had concerns about domestic violence occurring, because S.M.R. told her that on multiple occasions "daddy" hit mom and there was screaming and yelling. Wade–Zeller admitted that she did not know if "daddy" was appellant, and the trial court acknowledged this. DFPS, however, then asked Wade–Zeller if the "father [appellant], all three of these children refer to the male you've been discussing in terms of domestic violence and so for the as 'daddy'?" and she replied, "Yes."

*The forensic services supervisor*

DFPS's third witness was Lisa Bourgoyne, a Forensic Services supervisor at CAC, and the trial court accepted her as an expert on forensic evaluation. Bourgoyne's only knowledge of the case is from reading the extended forensic evaluation of G.J.R. and watching the CAC interview. Bourgoyne has not had any direct contact with the children. Bourgoyne stated that the children were referred to CAC because they "had tested positive for herpes 1 and 2, and one of the children had disclosed they were taking a bath with their father."

The ad litem asked Bourgoyne if, based on her review of the information, she had an opinion as to whether the children were sexually abused. Bourgoyne stated "the likelihood of sexual abuse is there." She specifically referred to "licking and biting" between G.J.R. and her father, as well as the grandfather.

Appellant's lawyer established through Bourgoyne that G.J.R.'s five forensic evaluations were conducted in May and June 2010, ten months after Mullin's initial evaluation. Bourgoyne stated that she had no idea what happened to the children while in foster care, and did not dispute Mullin's prior testimony that she [Mullin] was unable to say whether the children were sexually abused. Bourgoyne agreed that it is appropriate for the forensic interviewer to establish who "daddy" is when a child is referring to someone as daddy. Appellant's lawyer and Bourgoyne had an extensive discussion about the house fire, "daddy" peeing on the fire, and whether "daddy" could have been appellant. Bourgoyne agreed she could not identify appellant as "daddy," and the trial court acknowledged that. Appellant's lawyer also discussed with Bourgoyne the lack of clarification of the context of any touching that occurred. Bourgoyne responded by pointing out that anatomical dolls were used to clarify.

Finally, appellant's lawyer questioned Bourgoyne about the summary of Mullin's interview of G.J.R. which states that she "disclosed details that are highly suggestive of sexual victimization and exposure. That is, her dad was rubbing her when she was rubbing him." Bourgoyne was unable to point to any place in Mullin's CAC interview that describes G.J.R. and her "dad" rubbing each other. Bourgoyne again admitted that CAC was not able to specifically identify "dad" and the trial court acknowledged this.

*The caseworker supervisor*

DFPS's fourth witness was Carly McGrew, a caseworker supervisor for DFPS who was offered for her expertise on the issue of permanency. At a November 12, 2009 conference with appellant, he gave McGrew a copy of his test result for herpes. McGrew's testimony was that appellant "handed me a positive result test for herpes, which was also similar to a test

we had on the children." McGrew further testified that all three children had been diagnosed with "[h]erpes one and two"—a statement which is not supported by the medical records.

During the conference, appellant told McGrew that he "knew there was a man the mom had in his home that he felt, told him that he was going to abuse his children." Appellant also told McGrew that the children were at a birthday party where another child had "herpes on their mouth, and he saw his child kiss that child." McGrew said that appellant admitted to her that he had not reported his suspicions to law enforcement. During a February 9, 2010 conference with appellant, McGrew discussed a "red bump" on C.N.R.'s bottom that was discovered by the aunt. McGrew stated that appellant had nothing to say about what might have caused that.

On cross-examination by appellant's lawyer, McGrew admitted that S.M.R., G.J.R., and C.N.R. had all tested negative for genital herpes in August 2009 and that her agency knew that. McGrew testified that she believed that C.N.R. exhibited symptoms of genital herpes because of statements made to her by the "caregiver and the aunt." McGrew said, "The aunt believed the marks on the child's bottom near their, their private areas were—the bumps were a symptom of herpes." McGrew also initially stated that she believed there was something from a doctor concerning C.N.R. having herpes, but then said she did not remember.

Appellant's lawyer then discussed the statement in the March 30, 2010 permanency plan that stated, "The children have all tested positive for herpes one and two. The girls were tested a second time and their results were negative." McGrew said, "We spoke to the pediatricians who state herpes is hard to detect." McGrew stated that she did not know if any of the children had manifested any symptoms of genital herpes since the August 2009 negative test results, as she was not the supervisor throughout that entire time.

McGrew conceded that, up until the initial referral, there was no verbal outcry of sexual abuse and no nonverbal indications of sexual abuse with respect to C.N.R. Appellant's lawyer showed her C.N.R.'s July 1, 2009 psychological evaluation, which states, "The caregiver has not noted any signs or concerns suggestive of sexual abuse."

Regarding G.J.R., McGrew discussed the July 3, 2009 outcry that "her father showers with her." Appellant's lawyer asked McGrew if she knew who G.J.R. was referring to, and McGrew stated that her understanding was that "the father" was appellant.

McGrew stated that the children lived with appellant from June 2008 until September 2008, when they went to live with their maternal aunt. She said he left them with the aunt because he was "being arrested."

On cross-examination by the mother's lawyer, McGrew said that the mother named appellant as a possible perpetrator of child abuse because appellant had previously dated a fourteen year-old girl. The mother, however, never went to the police or filed a CPS report accusing appellant of abusing the girls.

On cross-examination by the ad litem, McGrew agreed that it was "possible for someone to test negative when in fact they have herpes." She also agreed that "you would need an active outbreak at the time for it to test positive" and that would "explain why these little children tested negative for herpes when in fact they did have it." McGrew stated that she believed that was the case with the three girls.

The ad litem discussed appellant's prior convictions with McGrew, and she said that his criminal history gave her concerns about his ability to care for the children to the point of recommending termination of his parental rights.

On cross-examination by appellant's lawyer, McGrew stated she did not know if appellant had tested positive for drug use during the pendency of the case. She conceded that appellant's last drug conviction was in 1992 and that she had no personal knowledge that he had used drugs since then; however, she nonetheless was still concerned about his drug use affecting the children. Appellant's lawyer clarified that since the birth of the children, appellant had only been convicted of four misdemeanors (terroristic threat, interfering with an emergency telephone call, criminal trespass, and harassment). McGrew conceded that DFPS never requested a criminal investigation of appellant.

*The CPS specialist*

DFPS's fifth witness was Lanicia McCray, a CPS specialist. McCray testified concerning both the mother and father's compliance with the family service plan. McGrew also agreed with following question from DFPS's lawyer: "Have you been informed of by anybody, including the children's pediatrician, that on at least one occasion each and every one of these children have [sic] been diagnosis as being positive for herpes one and two?" Appellant's lawyer told the trial court that he would wait for his cross-examination to contest this statement, and the following exchange occurred:

> Q. (By DFPS's lawyer) Now is it your understanding that the children came up positive for herpes, not just on June 15th of this year but prior to this year?
>
> A. Yes.

> Q. All right. Does the agency have copies of every positive herpes test that has been run of these children as they were brought to their pediatrician on a regular basis?
>
> A. No, we do not.
>
> THE COURT: How many have there been?
>
> THE WITNESS: At least three.
>
> THE COURT: And how come you don't have records?
>
> THE WITNESS: From the foster care agency, I didn't receive them.
>
> THE COURT: You get them from the foster care agency?
>
> THE WITNESS: Yes, from their worker.

McCray also testified that CPS confirmed that appellant's previous girlfriend was fourteen and the mother was sixteen when he first met her.

McCray stated that the initial reason that the children were removed was because of neglectful supervision and medical neglect, because the girls were underweight and had scabies, and G.J.R. had a sprained ankle. When she interviewed the mother, McCray was told that appellant drinks a lot when she is not there and that she was worried about him being with the kids.

McCray said that CPS was concerned about appellant's living arrangements, because he was staying with his current girlfriend, who lived in a trailer with her own children. CPS was also concerned whether appellant could financially support the children, his past history of domestic violence, and "possible sexual abuse."

On cross-examination by appellant's lawyer, McCray acknowledged that on January 12, 2010 she "signed off on" a December 8, 2008 treatment plan for G.J.R from Depelchin Children's Center that contains

the following progress update: "[G.J.R.'s] bio mother has moved to Alabama and her bio father has been cleared of any charges related to the sexual abuse of [G.J.R] and her bio siblings." The mother moved to Alabama with her new boyfriend, Robert Boiter. Although she read the treatment plan, she did not write it, and she testified that she still had personal concerns about sexual abuse even though she signed off on the plan. McCray later testified that she does not make "a habit of signing off on documents that aren't true."

On redirect from DFPS's lawyer, McCray stated that she could not get a copy of the Depelchin report unless she signed for it and her signature was an acknowledgment of receipt, not an approval of the report. McCray also said she had no knowledge that appellant had ever tested positive for drugs.

*The guardian ad litem*

DFPS's sixth witness was Nikki Golyer, the guardian ad litem for the children. Golyer's number one concern for recommending termination of appellant's parental rights were the allegations of sexual abuse, G.J.R.'s outcries during her interview with Mullin, and sexual behaviors displayed at the foster home. Golyer has attended therapy sessions with the children, and in response to a question from DFPS's lawyer she responded that she has neither heard any outcries from any of them nor heard anything about them being abused or neglected by any one of their parents.

*The appellant*

DFPS's seventh witness was appellant. DFPS's lawyer asked appellant about his convictions for terroristic threat on the mother, interference with an emergency telephone call (also involving the mother), criminal trespass, and harassment. This exchange did not appear to elicit anything relevant. After discussing appellant's compliance with DFPS's service plan, he was asked why he presented a copy of his STD test on November 12, 2009 to McGrew. Appellant recalled that he presented it to McGrew because he was asked by a Ms. Roland to get tested and to give the result to his CPS caseworker.

Appellant discussed telling McCray that the children were living with their mother and her boyfriend, Dustin Armstrong, and that Armstrong had threatened to sexually abuse his daughters. The mother called appellant, which is how he first learned about this: "Dustin said he's gonna have sex with your daughters and she was laughing about it. And I was, you think that's funny. And she said you know he's just joking." Appellant then called Armstrong, who confirmed that he made the statement.

Appellant reported Armstrong to both CPS and the Galveston Police Department, but did not recall the date. Appellant said the officer never made a report because the officer said "you and your ex-girlfriend ... are ... arguing.... [T]hey're just playing with your head.... [I]f you don't have any proof, we can't do nothing about it." In response to a question from DFPS's lawyer, appellant denied knowing that the mother had serious mental health issues, such as bipolar disorder and manic depression, or that she took medication while she lived with him.

DFPS's lawyer asked appellant the following: "Okay. Sir, what is your explanation for all three of your children having tested positive for herpes one and two?" Appellant's lawyer objected to mischaracterization of the evidence and appellant not being a medical expert. The trial court said, "Okay. There's a lot of conflicting evidence. You have documents that don't say the same thing. Now do you want to be more specific with this witness as to

which document?" DFPS's lawyer then asked appellant, "[A]re you aware that Petitioner's Exhibit No. 11 shows that your daughter, S.M.R., tested positive for herpes one and two on June 15th of 2010?" Appellant answered, "From what I'm aware, yes."[1]

Continuing this line of inquiry, DFPS's lawyer asked appellant, "Are you aware that Petitioner's Exhibit No. 12 is a positive test for G.J.R. taken the same date, June 15th of 2010, that she tested positive for herpes?" Appellant answered, "Yes." DFPS's lawyer next asked appellant, "You're aware that there is a positive— there has been at least one positive test showing the same thing for [C.N.R.], your youngest child?" Appellant's lawyer objected, "Judge, that document is not in evidence in this case." The trial court overruled the objection, and appellant answered, "Yes."

DFPS's lawyer asked appellant if he knew the day after he returned the children to the mother on December 22, 2008 that the two older children had redness around their vaginas. Appellant replied that he was not aware and agreed that he had custody of the children for three months prior to that date. There followed an extended discussion of appellant's noncompliance with the service plan and attendance at court hearings. Appellant explained that he and his current girlfriend were moving into a four-bedroom house that belongs to the girlfriend's mother. If he got custody of his daughters back, there would be three adults and five children living in the house.

On cross-examination by the ad litem, appellant said that the mother was eighteen when her first started dating her, but does not know her birth date. He lived with her for four years, and he is now forty-two. The ad litem asked appellant if he had ever dated anyone under the age of seventeen since he became seventeen. Appellant replied, "Not that I remember." Appellant admitted to: (1) arguing with the mother in front of the children, but denied pulling her hair; (2) ripping the telephone off the wall while the children were sleeping in the house; and (3) using marijuana "maybe about two, three years ago" and cocaine "more than five years" ago. Appellant said he had not consumed alcohol in "probably about four years."

On the last day of trial, DFPS's lawyer offered medical records for C.N.R., which he subpoenaed from Texas Children's Hospital. The trial court sustained appellant's objection, and the records were not admitted.

On cross-examination by his lawyer, appellant again discussed the fire at the Galveston home where the mother was living with Armstrong and the children and G.J.R.'s statement that "daddy" peed on the fire. The trial court noted that appellant "already established that he's never lived there. That's very clear to this court. . . . And he was not involved in that fire."

Appellant denied having ever done anything inappropriate with S.M.R., G.J.R., or C.N.R. His lawyer asked the following:

Q. . . . Okay. You've heard all this testimony about, you know—all the documents about, you know, whether these girls have herpes, or don't have herpes. Are you able to tell the Court whether or not, of your personal knowledge, whether or not the mother of these children has herpes?

A. No.

---

1. We note that the exhibit does not reflect a June 15, 2010 doctor's visit or lab result. The June 15, 2010 appears to be the date the information was printed from the Texas Children's Hospital Health Information Management database.

Q. You don't know?

A. I don't know.

Appellant testified that the mother would leave with the children and that she "ran to" other men such as Dustin Armstrong and another man named Corey or Kerry. The mother told appellant that she was having sex with other men.

Appellant testified that he had the children for three months until December 2008, when he left the children with their aunt because he turned himself in on an arrest warrant for an inspection or registration sticker. He was in jail for two weeks.[2] When he got out of jail, he did not go back and pick the children up from the aunt because she had moved. He told the trial court that he did not go looking for the children because he did not know where they moved to.

*Closing arguments*

The ad litem requested that appellant's rights be terminated because of "evidence that the father's drug use, criminal history was testified that he sexually abused the children." "And there's testimony that both the father and the mother frequently left the children with relatives and didn't return for months at a time to come back and get them. For instance the father testified that he turned himself in on a Class C traffic warrant and didn't even find out till [sic] four months later that the children were in CPS care. That was based on his own testimony."

Appellant's lawyer responded:

Let's address (d) and (e). This whole case, Judge, has been nothing more than rank speculation about medical tests that have been on both sides. We got in evidence, you'll find, you'll find that there may be a positive test result for—

and I can't remember which girls—and negative test results. There is no conclusive evidence before the Court that these girls have a sexually transmitted disease. But furthermore, there is absolutely no evidence before this Court that anyone—or how any—if they even have a sexually transmitted disease, that it was communicated or transferred. There's no testimony in the record whatsoever how any transmission of a sexually transmitted disease took place. There's nothing in the record.

With respect to the—you know, it seems that the agency's relying on the criminal record of my client. The criminal record that is relevant to this case, 1994 conviction for delivery of a controlled substance or whatever it was, Judge, was ten years before the first child in this case was born, okay? The other offenses that took place during the time when these children were alive are misdemeanor offenses, none of which involve the children, none of which in anyway threaten the children's lives, none of which in anyway endangered the children's lives. They are—with respect to the (e) grounds, there is no conduct that they have put before this Court—there's no evidence of any conduct to show that anything that my client did endangered the physical or emotional well being of these children.

Any time that these children—at least any time that these children were left with someone, they were always left with a family member and my client and [the mother] had separated. They weren't together anymore and she was living with some other guy in a trailer down in Galveston. I don't know. I don't see—I don't see how the agency

---

**2.** Although not discussed at trial, we assume that appellant voluntarily went to jail to pay off the fine.

makes a case against my client for allowing my child—the children to remain in conditions or surroundings which endanger physical or emotional well being of the child. The children were brought into care, not for anything that my client did.

Judge, I know you're well aware of all the exhibits that have been admitted in this case and the evidence that's before the Court, but I ask the Court to look carefully. The business of the sexually transmitted diseases is a red herring. There's nothing—there's nothing in the record that substantiates that these children have such a thing and that's the only thing in this case that the department wants you to hang their hat on. That's what this whole case is about. They have denied my client access to his children for going on two years now.

DFPS argued for termination as follows:

As to the father, the evidence is circumstantial, but it's strongly circumstantial and the Court is allowed to consider it. But given the fact that the father tested positive for herpes and [S.M.R.] and [G.J.R.], as indicated in Petitioner's Exhibits Nos. 10 through 12—

[Appellant's lawyer]: Judge, objection. In this case there is evidence. Not only that, the exhibit that he's saying is a negative test result, so it's not true.

[DFPS's lawyer]: Judge, let me clear the record up. The negative test—

THE COURT: Overruled.

[DFPS's lawyer]: Thank you.—that Mr. Newhouse is referring to is 13, that's for [C.N.R.], that's what we tried to correct today. But I'm just speaking of [S.M.R.] and [G.J.R.]. So we have two very small children contracting herpes which can be transmitted other than through sexual contact, but it's very unlikely. But apart from the sexually

transmitted disease issue, Judge, the fact is that the respondent failed to comply with the family service plan.

The, the uncontested testimony of the caseworker was that long before [appellant] started emailing either her or Ms. McGrew the assigned caseworker Ms. Lanicia McCray had maintained regular contact and had conversations, including personal conversations with [appellant] about what it was he's supposed to do.

Mr. Newhouse would have the Court believe that because he lived in Galveston that the agency stonewalled his ability to comply with the family service plan, that is not supported by the evidence and the testimony of both caseworkers, Ms. Carly McGrew and Ms. Lanicia McCray.

As far as (d) is concerned, Judge, I believe the sufficient testimony show that the father knew or had reason to know that the mother had serious mental health issues. But more than that—

[Appellant's lawyer]: I heard him testify he didn't know.

[DFPS's lawyer]: But more than that, I believe that the testimony regarding his alleged report of the man he thought had—

THE COURT: You said the father said that?

[DFPS's lawyer]: Yes, ma'am.

THE COURT: And you stand corrected on that. He said he didn't know.

[DFPS's lawyer]: Okay.

THE COURT: But go ahead.

[DFPS's lawyer]: Regarding the father's testimony that he went to a police station, talked to a police officer about an allegation that a man had threatened to rape his three minor girls, I think is less than credible. The father has failed to show, that in fact he is able to comply or to provide a safe and stable home for

the child. So I believe the third prong of the (o) test has been met.

He shows up during the trial with certificates that he was required under the family service plan to give to the caseworker. Some of those services he performed and that there is not evidence that he successfully completed were completed late in the case and even giving him credit for those, there's a number that he failed to complete. If I counted the number of meetings that he attended through a twelve step program, it was less than 20. This case has been open for 18 months.

The psychological evaluation and the substance abuse evaluation indicated that he had an alcohol abuse problem. I think the evidence shows that between his criminal record and looking at Petitioner's Exhibit No. 22B, the psychological evaluation of [appellant], that he continues to be in denial about his drug and alcohol problem and that those have not been addressed. So I don't believe that a person—and again, I would submit that the Court read 22B and see what the psychologist had to say about his likelihood of him maintaining a strong recovery is minimal. Those are the words of the psychologist. So I believe that the State has born its burden to show that the father's rights should be terminated pursuant to (d), (e), and (o) of subsection 161.001.1 of the Texas Family Code.

On appeal, DFPS's brief refers to some portions of the exhibits that were not argued at trial.

*The order terminating parental rights*

Following the bench trial, the trial court signed an order terminating appellant's parental rights to the three children on the following grounds:

9.1 The Court finds by clear and convincing evidence that termination of the

parent-child relationship between [appellant] and the children [S.M.R., G.J.R. and C.N.R.], is in the children's best interest.

9.2 Further, the Court finds by clear and convincing evidence that appellant has:

9.2.1. knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children, pursuant to § 161.001(1)(D), Texas Family Code; and

9.2.2. engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children, pursuant to § 161.001(1)(E), Texas Family Code.

Although requested by DFPS, the trial court did not terminate based on section 161.001(1)(O) (failure to comply with court order specifically establishing actions necessary for parent to obtain return of child).

Because both appellant's and the mother's parental rights were terminated, the trial court appointed DFPS as managing conservator of the children, as required by Family Code section 161.207. TEX. FAM. CODE ANN. § 161.207 (West 2008).

## Standard of Review

 The evidence in support of termination must be clear and convincing before a court may involuntarily terminate a parent's rights. *Santosky v. Kramer,* 455 U.S. 745, 747, 102 S.Ct. 1388, 1391–92, 71 L.Ed.2d 599 (1982); TEX. FAM.CODE ANN. § 161.001 (West Supp. 2011). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM.CODE

ANN. § 101.007 (West 2008); *In re J.F.C.,* 96 S.W.3d 256, 264 (Tex.2002). Because termination findings must be based upon clear and convincing evidence, not simply a preponderance of the evidence, the Texas Supreme Court has held that the traditional legal and factual standards of review are inadequate. *In re J.F.C.,* 96 S.W.3d at 264–67. Instead, in conducting a legal-sufficiency review in a termination-of-parental-rights case, we must determine whether the evidence, viewed in the light most favorable to the finding, is such that the fact-finder could reasonably have formed a firm belief or conviction about the truth of the matter on which the State bore the burden of proof. *See id.* at 266–67. In viewing the evidence in the light most favorable to the judgment, we must assume that the fact-finder resolved disputed facts in favor of its finding if a reasonable fact-finder could do so, and we should disregard all evidence that a reasonable fact-finder could have disbelieved or found to have been incredible. *In re J.P.B.,* 180 S.W.3d 570, 573 (Tex.2005) (quoting *In re J.F.C.,* 96 S.W.3d at 266).

### Grounds for Termination

◼ In proceedings to terminate the parent-child relationship brought under Family Code section 161.001, DFPS must establish, by clear and convincing evidence, one or more of the acts or omissions enumerated under subsection (1) of section 161.001 and that termination is in the best interest of the child. Tex. Fam.Code Ann. § 161.001. Both elements must be established, and termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd,* 727 S.W.2d 531, 533 (Tex.1987). We will review the sufficiency of the evidence presented under the specific statutory grounds found by the trial court in its termination order. *Cervantes–Peterson v. Tex. Dep't of Family &*

*Protective Servs.,* 221 S.W.3d 244, 252 (Tex.App.-Houston [1st Dist.] 2006, no pet.).

### Sufficiency of the Evidence

In issues one and two, appellant argues that the evidence is legally and factually insufficient to support the trial court's termination of his parental rights because DFPS did not present any evidence that appellant (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the physical or emotional well-being of the children or (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional well-being of the children. In issue three, appellant argues that the evidence is legally and factually insufficient to support a finding that termination was in the best interest of the children.

### Legal sufficiency

In conducting a legal sufficiency review in a termination-of-parental-rights case, we must determine whether the evidence, viewed in the light most favorable to the finding, is such that the fact-finder could reasonably have formed a firm belief or conviction about the truth of the matter on which the State bore the burden of proof. *Cervantes–Peterson,* 221 S.W.3d at 249 (citing *In re J.F.C.,* 96 S.W.3d at 266). In viewing the evidence in the light most favorable to the judgment, we must assume that the fact-finder resolved disputed facts in favor of its finding if a reasonable fact-finder could have done so, and we should disregard all evidence that a reasonable fact-finder could have disbelieved or found to have been incredible. *Id.* (quoting *In re J.P.B.,* 180 S.W.3d at 573).

◼ Evidence was admitted without objection that the children tested positive for

oral and genital herpes.[3] Viewed in the light most favorable to the order of termination and assuming that the fact-finder resolved disputed facts in favor of its finding, the evidence is legally sufficient that appellant engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional well-being of the children.

Because there is legally sufficient evidence of one ground for termination, we need not review the legal sufficiency of the other ground, that appellant knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the physical or emotional well-being of the children. We must, however, determine the legal sufficiency of the evidence that termination was in the best interest of the children because Family Code section 161.001 requires that DFPS establish, by clear and convincing evidence, (1) one or more of the enumerated acts or omissions and (2) that termination is in the best interest of the child. *See* TEX. FAM.CODE ANN. § 161.001.

█ In determining whether the termination of appellant's parental rights was in the children's best interest, we may consider several factors, including (1) the children's desires, (2) the current and future physical and emotional needs of the children, (3) the current and future physical and emotional danger to the children, (4) the parental abilities of the person seeking custody, (5) whether programs are available to assist the person seeking custody in promoting the best interests of the children, (6) plans for the children by the person seeking custody, (7) the stability of the home or proposed placement, (8) acts or omissions of the parent that may indicate that the parent-child relationship is not proper, and (9) any excuse for acts or omissions of the parent. *Holley v. Adams,* 544 S.W.2d 367, 371–72 (Tex.1976); *In re L.M.,* 104 S.W.3d 642, 647 (Tex.App.-Houston [1st Dist.] 2003, no pet.). The *Holley* factors are not exhaustive, and there is no requirement that DFPS prove all factors as a condition precedent to parental termination. *See In re C.H.,* 89 S.W.3d 17, 27 (Tex.2002).

█ With regard to the children's desires, the children did not testify or speak directly to the trial court. Wade–Zeller, however, testified that the children would like to stay with their foster parent. As to the children's current and future physical and emotional needs, as well as the current and future physical danger to them, we have already held there to be legally sufficient evidence that appellant engaged in or knowingly placed the children with others who engaged in conduct which endangered the children's physical or emotional well-being. With regard to appellant's "parental abilities," his testimony regarding his inability to look for his children because their maternal aunt moved and he did not know where to find them, is sufficient to sustain that factor. Finally, with regard to programs available to assist the person seeking custody, there was evidence that appellant was provided a family service plan requiring him to complete classes, and he did not. We hold there is legally sufficient evidence to sup-

---

3. Assuming, without deciding, that expert testimony was required on the issue of herpes, we note that the trial court accepted Mullin as an expert in forensic interviewing, and she testified that "they [the children] tested positive for herpes." Neither DFPS nor appellant sought to define the scope of Mullin's qualifications as an expert. Appellant was therefore required to object to her qualifications as an expert or object to this evidence either before trial or when the evidence was offered. *See Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 409 (Tex.1998).

port the trial court's finding that termination of appellant's parental rights was in the best interest of the children, and we overrule the legal-sufficiency portions of issues two and three and do not reach the legal-sufficiency portion of issue one.

**Factual sufficiency**

 A factual sufficiency review of a termination-of-parental-rights case requires our determination of whether, considering the entire record, including evidence supporting and evidence contradicting the finding, a fact-finder could have reasonably formed a firm conviction or belief about the truth of the matter on which the State bore the burden of proof. *Cervantes–Peterson*, 221 S.W.3d at 250 (citing *In re J.P.B.*, 180 S.W.3d at 573; *In re C.H.*, 89 S.W.3d at 25). We consider whether the disputed evidence is such that a reasonable fact-finder could not have resolved the disputed evidence in favor of its finding. *Id.* (citing *In re J.F.C.*, 96 S.W.3d at 266–67). If, in light of the entire record, the disputed evidence that a reasonable fact-finder could not have credited in favor of the finding is so significant that a fact-finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.* (quoting *In re J.F.C.*, 96 S.W.3d at 266).

 We begin with a factual sufficiency review of the evidence to terminate appellant's parental rights under section 161.001(1)(E), i.e., that he engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional well-being of the children. First, there is no documentary medical evidence in the record that any of the daughters have genital herpes or any other sexually transmitted disease. There is also no documentary

medical evidence in the record that the father has oral herpes.

A layperson's reading of the medical records suggests that only appellant tested positive for HSV type 2 (genital). S.M.R. tested positive for HSV type 1 (oral) and negative for HSV type 2 (genital). G.J.R. tested positive for HSV type 1 (oral) and negative for HSV type 2 (genital). C.N.R. tested negative for HSV type 2 (genital), and there is no test result in the record for C.N.R. concerning HVS type 1 (oral). Despite the absence of evidentiary support, the record is replete with statements that the children tested positive for both oral and genital herpes, including reference to other tests and hearsay statements from pediatricians concerning the detection of herpes, some of which was objected to and some of which was not. No evidence was offered at trial as to whether any other individuals who had lived with the children or associated with them had been tested for herpes. Further, there was no expert medical testimony proffered concerning transmission of the two types of the virus or whether either could be contracted apart from sexual contact.

Appellant has argued on appeal that DFPS:

> failed to present any witness that was competent to interpret the test results or even inform the trial court about any of the following material aspects of herpes:
>
> 1. How it is transmitted and how it can be transmitted;
>
> 2. How far back in time do the tests go;
>
> 3. Can a person who has type 2 herpes transmit type 1 to another person or vice versa;
>
> 4. If S.M.R. and G.J.R. came into DFPS care in April of 2009, why was it only discovered that they may have or had type 1 herpes in July of 2010; and,

5. What proof is there that they might have had type 1 herpes before April of 2009?

These are valid arguments. DFPS also acknowledged during its closing argument that "herpes ... can be transmitted other than through sexual contact."

■ Second, DFPS never provided direct evidence that the children's references to sexual abuse by "dad" and "daddy" refer to appellant, something the trial court acknowledged. Bourgoyne, a supervisor for CAC, testified that a forensic interviewer should establish who "daddy" is when a child is referring to someone as daddy, and she admitted that was not done in this case.

Third, the treatment plan for G.J.R from the foster care agency stated, "[G.J.R.'s] bio mother has moved to Alabama and her bio father has been cleared of any charges related to the sexual abuse of [G.J.R] and her bio siblings." Golyer, the guardian ad litem for the children who attended therapy sessions with the children, stated that she had neither heard any outcries from any of them nor heard anything about them being abused or neglected by either of their parents.

Fourth, although DFPS introduced evidence of appellant's prior criminal record, the only offenses that occurred after the birth of appellant's oldest child were misdemeanors. DFPS does not argue that these offenses occurred in the children's presence or that they suffered any actual injury from them.

■ We next review the evidence to terminate appellant's parental rights under section 161.001(1)(D), i.e., that he knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the physical or emotional well-being of the children. On appeal, DFPS does not seriously argue

this as an independent ground. After appellant and the mother separated in 2007, the children primarily lived with the mother or with a maternal aunt. Appellant kept the children from June to September 2008 and then returned them to the maternal aunt from September 24 to December 22, 2008.

The evidence discussed at trial concerning the children's time with the mother or the maternal aunt was (1) that a fire occurred in July 2008 at the Galveston residence where the children stayed with the mother and another man, Dustin Armstrong, and (2) that Armstrong allegedly threatened to molest the children. DFPS does not argue that appellant knew the fire could have happened, nor does the record support such a finding. Further, there is evidence in the record that appellant spoke to the Galveston Police Department about Armstrong's threats.

In its appellate brief, DFPS refers to exhibits that were admitted, but not discussed, at trial. These exhibits include the mother's psychological evaluation, which contains the following statement: "She stated that the children witnessed their father being physically, verbally and sexually abusive to their [mother]." Had that statement been raised at trial and subjected to the adversarial system for discerning truth that our society continues to use, then a failure by appellant to challenge that statement would end our factual-sufficiency inquiry. We do not dispute that the exhibits are in evidence. But it shocks our conscience for DFPS to suggest that a judgment can be factually sufficient based on evidence never discussed or argued to the fact-finder.

If factual-sufficiency review still allows an intermediate appellate court to reverse a legally sufficient judgment and remand the case to the trial court for further proceedings, then surely an appropriate exer-

cise of that power allows the court of appeals to discount relevant, probative evidence which was admitted, but never discussed or argued to the fact-finder. In this case, there is nothing in the record to show that the fact-finder ever considered any exhibits that were admitted but not discussed or argued at trial.

Considering the entire record, including both evidence supporting and evidence contradicting the findings, we hold that a fact-finder could not reasonably have formed a firm conviction or belief about the truth of the matters on which the State bore the burden of proof, i.e., the grounds for termination under section 161.001(1)(D) and (E). We agree with appellant that this case at trial was focused on sexual abuse and sexually transmitted diseases and that the evidence to support termination was factually insufficient.

Because there is factually insufficient evidence of both grounds for termination, we need not review the factual sufficiency of the evidence that termination was in the best interest of the children. We sustain the factual-sufficiency portions of issues one and two and do not reach the factual-sufficiency portion of issue three.

## Conclusion

We reverse the final order of termination and remand the case to the trial court for further proceedings.

Justice JENNINGS, concurring.

Justice BROWN, dissenting.

TERRY JENNINGS, Justice, concurring.

I agree, albeit for different reasons, with both of my colleagues that the evidence is legally sufficient to support a finding that appellant, S.H.R., engaged in conduct which endangered the physical or emotional well-being of his children. *See* Tex.

Fam.Code Ann. § 161.001(1)(E) (Vernon Supp. 2011). I also agree, again, for different reasons, with Justice Sharp that the evidence is factually insufficient to support such a finding. Accordingly, I write separately to explain why I agree.

## Standard of Review

A parent's right to "the companionship, care, custody, and management" of his children is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982) (internal citation omitted). The United States Supreme Court has emphasized that "the interest of parents in the care, custody, and control of their children is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49 (2000). Likewise, the Texas Supreme Court has also concluded that "[t]his natural parental right" is "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex.1985). Consequently,

[T]ermination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent.

*Id.* (emphasis added).

Because termination of parental rights "is complete, final, irrevocable, and divests for all time that natural right ..., the evidence in support of termination must be *clear and convincing* before a court may involuntarily terminate a parent's rights." *Id.* (citing *Santosky*, 455 U.S. at 747–48, 102 S.Ct. at 1391–92; *Richardson v. Green*, 677 S.W.2d 497, 500 (Tex.1984)) (emphasis added). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the

trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM.CODE ANN. § 101.007 (Vernon 2008); *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex.2002). Because the standard of proof is "clear and convincing," the Texas Supreme Court has held that the traditional legal and factual standards of review are inadequate. *In re J.F.C.*, 96 S.W.3d at 264–66.

Instead of requiring just more than a scintilla of evidence to support a finding, we, in conducting our legal-sufficiency review in parental-rights termination cases, must determine whether the evidence, viewed in the light most favorable to the finding, is such that the fact finder could reasonably have formed a firm belief or conviction about the truth of the matter on which the Department of Family and Protective Services ("DFPS") bore the burden of proof. *See id.* at 266. In viewing the evidence in the light most favorable to the judgment, we "must assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so," and we "should disregard all evidence that a reasonable fact finder could have disbelieved or found to be incredible." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (citing *In re J.F.C.*, 96 S.W.3d at 266).

However, a fact finder may not, from meager circumstantial evidence, reasonably infer an ultimate fact, none more probable than another. *Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 392 (Tex. 1997). This Court has explained that under the law of evidence, the term "inference" means,

[A] truth or proposition drawn from another which is supposed or admitted to be true. A process of reasoning by which a fact or proposition sought to be established is deduced as a logical conse-

quence from other facts, or a state of facts, already proved.

*Marshall Field Stores, Inc. v. Gardiner*, 859 S.W.2d 391, 400 (Tex.App.-Houston [1st Dist.] 1993, writ dism'd w.o.j.) (quoting BLACK'S LAW DICTIONARY 700 (5th ed. 1979)). Thus, to "infer" a fact, one "must be able to deduce that fact as a logical consequence from other proven facts." *Id.* In other words, there must be a logical and rational connection between the facts in evidence and the fact to be inferred. *United States v. Michelena–Orovio*, 702 F.2d 496, 504 (5th Cir.), aff'd on reh'g, 719 F.2d 738 (5th Cir.1983) (en banc). It is important to be mindful that " 'when the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence.' " *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex.1983)). And in regard to the sufficiency of evidence in circumstantial-evidence cases, one inference cannot be based upon another inference to reach a conclusion. *Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 728 (Tex. 2003). Conclusions based on such stacking do not constitute evidence. *Id.*

In conducting a factual-sufficiency review in a parental-rights termination case, we must determine whether, considering the entire record, including evidence supporting and evidence contradicting the finding, a fact-finder could have reasonably formed a firm conviction or belief about the truth of the matter on which DFPS bore the burden of proof. *Cervantes–Peterson*, 221 S.W.3d at 250 (citing *J.P.B.*, 180 S.W.3d at 573; *In re C.H.*, 89 S.W.3d at 25). The higher burden of proof in parental-rights termination cases alters the appellate standard of review: "a finding that must be based on clear and convincing evidence cannot be viewed on

appeal the same as one that may be sustained on a mere preponderance." *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex.2002). In considering whether disputed evidence rises to the level of being clear and convincing, we must consider whether the evidence is sufficient to reasonably form in the mind of the fact finder a firm belief or conviction as to the truth of the allegation sought to be established. *Cervantes–Peterson*, 221 S.W.3d at 250. We consider whether the disputed evidence is such that a reasonable fact-finder could not have resolved the disputed evidence in favor of its finding. *Id.* (citing *J.F.C.*, 96 S.W.3d at 266–67). If, in light of the entire record, the disputed evidence that a reasonable fact-finder could not have credited in favor of the finding is so significant that a fact-finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.* (quoting *J.F.C.*, 96 S.W.3d at 266).

### Endangerment

Here, to support the trial court's termination of S.H.R.'s parental rights, the record must contain clear and convincing evidence that he engaged in conduct which "endangered" his children. "Endanger" means to "expose to loss or injury" or to "jeopardize"; it consists of conduct that is "more than a threat of metaphysical injury" or the "possible ill effects of a less than ideal family environment"; although, a child need not suffer actual injury to constitute endangerment. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex.1987). Endangerment can occur through both the acts and omissions of a parent. *See In re R.D.*, 955 S.W.2d 364, 367 (Tex.App.-San Antonio 1997, pet. denied).

After considering all of the evidence in the light most favorable to the trial court's findings, the only evidence in the record from which the trial court could have reasonably formed a firm belief or conviction that S.H.R. in fact endangered his children is that of his abuse of the children's biological mother in front of the children. *See In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009). DFPS's exhibit number 22A, a document entitled "Newsom Psychological Evaluation," reveals un-objected to hearsay that the children's biological mother stated that the children witnessed S.H.R. being "physically, verbally and sexually abusive to their mother." From this evidence, the trial court could have reasonably inferred and formed a firm conviction or belief that S.H.R. endangered the children.

As noted by both of my colleagues, DFPS tried this case to the trial court on the allegation that S.H.R. had sexually abused the children. Its only evidence in this regard was that S.H.R. had tested positive for oral and genital herpes and hearsay evidence that the children also had tested positive for oral and genital herpes. However, the medical records in evidence are either silent or reveal that the children tested negative for genital herpes. Thus, DFPS did not present any evidence from which the trial court could have logically deduced that S.H.R. sexually assaulted the children. Indeed, there is no evidence that any attempt was ever made to prosecute S.H.R. for sexual assault of a child.

DFPS barely made mention of any other allegation of endangerment in the trial court in its closing argument in regard to the termination of S.H.R.'s parental rights. And, in its appellate brief, DFPS mentions scant details of other allegations—i.e., criminal history, domestic violence, frequent moving, and use of alcohol and drugs—only in footnotes. Thus, DFPS did not present any evidence, or even argument, about how any specific act of S.H.R.

actually endangered his children. For example, DFPS did not present any evidence or provide any reasoned analysis as to how appellant's one felony conviction for possession of cocaine in July 1992 endangered his children who were later born in 2003, 2005, and 2006. Nor did it temporally connect any of appellant's misdemeanor convictions for harassment, terroristic threat, or criminal trespass or his use of alcohol or marijuana to any specific endangerment of the children. One might easily surmise or have a strong suspicion that such conduct, assuming that it occurred after the children's births, could have somehow endangered them. But, from the evidence actually presented at trial, such endangerment cannot be reasonably inferred. And the evidence presented by DFPS does not support a firm belief or conviction of endangerment.

Nevertheless, as mentioned by DFPS in a footnote in its brief, it did introduce into evidence the Newsom Psychological Evaluation, which contains the hearsay statement of the children's mother that they witnessed S.H.R. being "physically, verbally and sexually abusive to their mother." However, this hearsay evidence, offered without any contextual evidence or explanation at all of when, how, or exactly what "abuse" occurred, is contradicted by S.H.R.'s direct testimony. Given how the case was presented to the trial court, it is highly doubtful whether the trial court considered or even read the mother's hearsay statement in this report. But, even if it did, a fact-finder could not have reasonably resolved the disputed evidence in favor of a finding of actual endangerment. *See Cervantes–Peterson*, 221 S.W.3d at 250 (citing *In re J.P.B.*, 180 S.W.3d at 573; *In re C.H.*, 89 S.W.3d at 25).

Because a fact finder, considering the disputed evidence in light of the entire record, could not have reasonably formed a firm belief or conviction that S.H.R. actually endangered his children, I would hold that the evidence is factually insufficient to support the trial court's finding of endangerment. *See id.* (quoting *J.F.C.*, 96 S.W.3d at 266). Accordingly, I agree that the judgment of the trial court should be reversed and the case remanded for further proceedings.

HARVEY BROWN, Justice, dissenting.

The Court holds that the evidence was factually insufficient to support termination of S.H.R.'s rights to his three children, S.M.R., G.J.R. and C.N.R., under Texas Family Code sections 161.001(1)(D) and 161.001(1)(E). The evidence does not demonstrate that S.H.R. sexually abused any of the children. But I believe the other evidence—specifically the evidence of domestic abuse, imprisonment, substance abuse, and neglect—is legally and factually sufficient to support termination of S.H.R.'s parental rights. I also conclude that the evidence is legally and factually sufficient to support the trial court's finding that termination of his parental rights was in the children's best interest. I therefore respectfully dissent.

### Grounds for Termination of S.H.R.'s Rights

The trial court determined that S.H.R. (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endanger their physical or emotional well-being; and (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangers their physical or emotional well-being. TEX. FAM.CODE ANN. § 161.001(1)(D), (E) (West 2011).[1]

---

1. Although requested by DFPS, the trial court did not terminate based on section

## A. Endangerment by environment or conduct

Section 161.001(1)(D) provides that a "court may order termination of the parent-child relationship if the court finds by clear and convincing evidence ... that the parent has ... knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child[.]" *Id.* § 161.001(1)(D). Section 161.001(1)(E) requires the trial court to find by clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child[.]" *Id.* § 161.001(1)(E). "To endanger means to expose a child to loss or injury or to jeopardize a child's emotional or physical health." *Jordan v. Dossey,* 325 S.W.3d 700, 723 (Tex.App.-Houston [1st Dist.] 2010, pet. denied) (internal quotation omitted).

A child is endangered under subsection (D) when the environment creates a potential for danger that the parent is aware of but disregards. *Id.* at 721; *In re M.R.J.M.,* 280 S.W.3d 494, 502 (Tex.App.-Fort Worth 2009, no pet.). Abusive or violent conduct by a parent, as well as illegal drug use and drug-related criminal activity, supports a conclusion that the children's surroundings endanger their physical or emotional well-being. *In re M.T.W.,* No. 01–11–00162–CV, 2011 WL 6938542, at *12 (Tex.App.-Houston [1st Dist.] (Dec. 29, 2011) (mem. op.) (citing *In re J.T.G.,* 121 S.W.3d 117, 125 (Tex.App.-Fort Worth 2003, no pet.)).

Under subsection (E), the relevant inquiry is whether evidence exists that a parental course of conduct endangered the child's physical or emotional well-being. *In re R.D.,* 955 S.W.2d 364, 368 (Tex.App.-San Antonio 1997, pet. denied). Subsection 161.001(1)(E) asks whether "the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act." *In re M.T.W.,* 2011 WL 6938542, at *12 (quoting *In re J.T.G.,* 121 S.W.3d at 125). Termination under subsection (E) must be based on more than a single act or omission—the evidence must demonstrate a voluntary, deliberate, and conscious course of conduct by the parent. *Jordan,* 325 S.W.3d at 723; *see also In re T.T.F.,* 331 S.W.3d 461, 483 (Tex.App.-Fort Worth 2010, no pet.); *see also In re M.T.W.,* 2011 WL 6938542, at *12. As a general rule, conduct that subjects children to a life of uncertainty and instability endangers their physical and emotional well-being. *In re S.D.,* 980 S.W.2d 758, 763 (Tex.App.-San Antonio 1998, pet. denied); *In re H.N.H.,* No. 02–11–00141–CV, 2012 WL 117861 (Tex.App.-Fort Worth Jan.12, 2012) (mem. op.); *In re M.T.W.,* 2011 WL 6938542, at *12.

Because the evidence concerning these two statutory grounds for termination is interrelated, an appellate court may consolidate its examination of the evidence for both grounds. *See In re M.T.W.,* 2011 WL 6938542, at *13; *see also In re J.T.G.,* 121 S.W.3d at 126.

### 1. Sexual abuse evidence

I agree with the Court that the evidence is factually insufficient to support DFPS's contention that the children were sexually abused. The vast majority of the evidence at trial addressed DFPS's contention that S.H.R. sexually abused and sexually transmitted herpes to the children (and failed to

161.001(1)(*O*) of the Family Code. *See* TEX FAM.CODE ANN § 161.001(1)(*O*) (West 2011) (providing for termination of parental rights based on failure to comply with court order specifically establishing actions necessary for parent to obtain return of child).

follow the family service plan, a finding that the trial court did not make). Because DFPS's case centers on allegations of herpes and sexual abuse, I begin my review of the sufficiency of the evidence there.

### a. Herpes evidence

DFPS's summarized the thrust of its position in the opening sentence of the summary of the argument in its brief: "This is a case about three very young little girls who all tested positive for a sexually transmitted disease indicating they were all exposed to sexual abuse." Because their father, S.H.R., "also tested positive for the same sexually transmitted disease," DFPS concludes that the evidence was sufficient to demonstrate that S.H.R. sexually abused them. If S.H.R. had sexually-transmitted herpes to them, this would be an easy case. But the evidence was legally insufficient to demonstrate that the children tested positive for the same type of herpes that S.H.R. had or that they contracted it through sexual contact.

### (i) Medical records

The medical records in evidence [2] reveal that the two oldest daughters, S.M.R. and G.J.R., have type one (oral) HSV (herpes). In late June 2009, they tested positive for "HSV 1/2 (non-type specific) IGG and IGM," triggering the DFPS investigation. The medical records stated that the tests were positive for "HSV 1 *or* 2" and or-

dered testing for type-specific confirmation in four weeks. S.M.R. and G.J.R. were tested in August 2009. The results were positive for type one (oral) herpes but negative for type two (genital) herpes.[3] That same month, the youngest daughter, C.N.R., tested negative for type two (genital) herpes. The gynecological "impressions" in both S.M.R.'s and G.J.R.'s June 15, 2010 medical reports state: "HSV type 1 positive (oral type) [and] HSV 2 negative (gen[it]al type)."

In sum, the medical records in evidence do not reflect any lab results in which any of the children tested positive for genital herpes. Although S.M.R. and G.J.R. tested positive for oral herpes, all of the medical records in evidence reflect negative test results for genital herpes. Additionally, with respect to the youngest child, C.N.R., the medical records reflect that she was only tested for genital herpes, not oral herpes, and that test came back negative.[4]

### (ii) Testimonial evidence

Despite the medical records, several witness testified that the children had tested positive for both type one (oral) and type two (genital) herpes. This testimony appears to be based largely on a misunderstanding of the June test results showing that two of the children tested positive for "HSV 1/2 (non-type specific)," which is elsewhere clarified as indicating "HSV 1 or 2." Carly McGrew, a DFPS caseworker supervisor who was offered for her exper-

---

2. The complete medical records of the children were never offered into evidence.

3. DFPS points out that S.H.R. conceded in cross-examination that the medical records from June 15, 2010 showed that S.M.R. tested positive for herpes types one and two and G.J.R. tested positive for herpes. But this contention is based on DFPS's characterization of these medical records, which S.H.R

had no expertise or medical knowledge with which to challenge.

4. The record also includes medical records in which the girls tested negative for both type one and type two herpes. Carly McGrew testified that herpes is difficult to detect because a person who has herpes will only test positive for herpes if the test is taken during "an active outbreak."

tise on the issue of permanency, testified that all three children had been diagnosed with "[h]erpes one and two." But McGrew later testified that she was not sure if any herpes tests were conducted prior to the August 2009 tests in which the children tested positive for oral herpes but negative for genital herpes. She also admitted that she had never seen a positive test result for genital herpes for C.N.R.; she was not asked whether she had ever personally seen a positive test result for the other two children.

Two other witnesses from DFPS summarily testified that the children suffered from both oral and genital herpes. Lisa Bourgoyne, a supervisor for the Forensic Services at the Harris County Children's Assessment Center (CAC), testified that the children were initially referred to CAC because, according to the information provided to CAC, all three "had tested positive for herpes 1 and 2, and one of the children had disclosed they were taking a bath with their father." [5] Bourgoyne did not testify as to personal knowledge of the herpes testing or that she had reviewed the medical records, but expressly based her testimony on the information provided to CAC by DFPS when it referred the case to CAC.

Lanicia McCray, a "specialist" with Child Protective Services, testified without objection that she had "been informed" that all of the children tested positive for both oral and genital types of herpes, though she did not identify who informed her of this. She then discussed the June 15, 2010 medical reports as "show[ing] the positive test for both [S.M.R. and G.J.R.]," though these reports indicate a positive test only for type one (oral) herpes. McCray admitted that DFPS does not have copies of all of the herpes test re-

sults. She offered no explanation for their omission, except that DFPS did not receive them from the foster care agency. The omission of some herpes test results would not be critical if the medical records in evidence confirmed her testimony, but they did the exact opposite.

There are also two documents in evidence, admitted without objection, containing hearsay statements indicating that all three children suffered from both oral and genital herpes: the "Extended Forensic Evaluation" prepared after G.J.R. underwent evaluation and DFPS's "Permanency Plan and Permanency Progress Report." The hearsay statements in these documents regarding herpes are either made by or attributed to someone at DFPS, not a medical record or provider. No evidence ties these representations to any specific medical records.

In sum, all of the evidence that the children had type two (genital) herpes appears to have originated with statements to this effect made by someone at DFPS. These statements are not supported by the medical records in evidence, and no witness has identified any specific medical record, in evidence or otherwise, as supporting these statements.

### (iii) Transmission evidence

DFPS suggested throughout the trial that the father, S.H.R., passed herpes to the children through sexual activity. But, as S.H.R. points out, there was no medical testimony to explain how either type one or type two herpes is transmitted, whether a person infected with type one can infect another person with type two, or even if both types can only be spread through sexual contact.

---

**5.** Claudia Mullin of CAC also testified that one reason for the investigation was that the children were bathing with their father. They also "seemed to be afraid of adults."

Wade–Zeller, the licensed professional counselor called to testify by DFPS, did not review any medical records for the children, but testified that if they had "sexually transmitted diseases" it would indicate that they had been sexually abused.[6] She did not otherwise offer any testimony about the transmission of herpes. S.H.R. tested positive for genital herpes in October 2009; there is no evidence that he ever tested positive for oral herpes. The evidence does not contain any herpes testing for the adult male who lived with their mother. The mother denied that she had herpes, but she was never tested. DFPS did not present a physician or other herpes expert or other evidence concerning the transmission of oral or genital herpes and specifically whether they could be transmitted by bathing together or whether type one (oral) herpes could be contracted from someone with type two (genital) herpes but not type one herpes. The "Extended Forensic Evaluation" acknowledges that DFPS was unable to determine if the children's herpes "was contracted sexually."

### b. Other sexual abuse evidence

DFPS also contends that forensic evaluations disclosed that G.J.R. was sexually abused by her "daddy," S.H.R. Virtually every one of DFPS's six witnesses testified that they had "concerns" about potential sexual abuse by the father. But they did not affirmatively give an opinion that S.H.R. had sexually abused G.J.R. Their opinions only reached the level of "concerns" because the sole source of the conclusion was an interview of G.J.R. that they readily conceded had problems that made it inconclusive and that required further evaluations of G.J.R. Those further evaluations were not completed because G.J.R. became upset during the interview process. At trial, none of the children were called as a witness. Nor did either side call Dr. Pessikof, a psychiatrist who was treating the children, the mother, or the foster parents to testify. Two witnesses who actually spoke directly with the children testified, but only one of them had heard any statements regarding sexual abuse and that was only for one child, G.J.R., who was four years old at the time of the interview.

The only person to whom an outcry statement was made was Claudia Mullin, a forensic interviewer with the CAC. She interviewed both of S.H.R.'s two oldest daughters, G.J.R. and S.M.R., who were five and six at the time of trial. Mullin did not identify any claims of sexual abuse by S.H.R. Mullin's interview of G.J.R. lasted thirty-seven minutes and its video recording was admitted into evidence. Mullin testified that G.J.R. described to her a number of events constituting sexual abuse by her "daddy" and paternal grandfather.[7]

---

6. DFPS admitted, however, that herpes may be transmitted without sexual contact.

7. In cross-examination, S.H.R. challenged the accuracy of G.J.R.'s description of the events regarding her father and mother because her parents separated in 2007, when she was only two years old. Mullin did not interview the youngest child, C.N.R., age two at the time of the interviews, because "she was too young and non-verbal at the time." S.H.R. also pointed out that during the interview G.J.R. in response to a question of whether anyone had "ever done anything to you that hurt you or you didn't like," did not identify any abuse. Instead she complained that her older sister was "always hitting her." During the "extended evaluation," G.J.R. also reported that she trusted her daddy, her daddy loved her, and she enjoyed playing with him.

S.H.R. also noted that G.J.R. made inconsistent statements when asked specific questions using anatomical dolls. For example, Mullin testified that during the interview she asked:

Mullin believed there was a "significant quality and quantity of details" provided by G.J.R.[8] Because Mullin was "concerned" about the accuracy of G.J.R.'s statements, she did not make any determination that sexual abuse had occurred; rather she recommended that an "extensive forensic evaluation" be conducted "because there was a need for clarification." She also testified that it was not her job to determine whether sexual abuse had occurred. Mullin explained:

> I was concerned because she was mixing two traumatic events together and it was getting muddy or unclear at that point which is why I recommended the extended evaluation. She kept talking about a fire that had happened in the home, and so it was hard to tell because of her age, and the two traumatic events that she was talking about to clarify what she was talking about at that moment, and how those two circumstances she was talking about in terms of the location and time fit in.

When asked whether, in her professional opinion, the children were sexually abused, she stated, "I don't have an opinion about that." She further stated, "I don't know because I don't do the full investigation. . . . [I] don't have an opinion about whether they were sexually abused."

Lisa Bourgoyne was a supervisor for CAC forensic services and signed the Extended Forensic Evaluation report. She likewise testified that the interview created concerns and therefore an evaluation was recommended so they "could clarify the information" and because "there was so much confusion" and "some inconsistencies."

> Q: "When you were at your mommy and daddy's, did someone ever touch you there . . . [p]ointing to the vagina?"
> A. And she said no.

There were also uncertainties regarding the identity of the "daddy" to whom G.J.R. referred in the interview. G.J.R. used the term "daddy" to describe action taken during a home fire by another man, sometimes referred to as the mother's "boyfriend," with whom the children and their mother lived at that time. The fire occurred at a home in Galveston where G.J.R. lived with her mother, the "boyfriend" who owned the home, and others. G.J.R. suffered nightmares about the fire, and there were suspicions that she started the fire because she did not want to move. She told Mullin that her " 'daddy' pulled out his penis and peed on" the floor in her room where the fire occurred. She said that she was "mad" at her daddy for "peeing on the carpet" in her room. According to G.J.R., he then spanked her and then took his clothes off as he drove his truck, and she in turn tried "to get my dad's truck with my teeth." S.H.R. testified that he never lived at the Galveston house and he was not present at the fire. The fire investigation report supports his testimony.

Mullin generally conceded that she "could not say" to whom G.J.R. was referring when she used the term "daddy" or "father." Mullin testified, "I asked her in the beginning who her daddy was, and I cannot tell you because I did not write verbatim what name she answered." She admitted that she did not clarify in the interview about whom G.J.R. was speaking when she used the word "daddy." Mullin admitted that she could not accurately answer whether " 'daddy' was either the man that mommy was involved with or [S.H.R.]."

8. Mullin testified, without explanation and in response to a leading question, that G.J.R.'s statements satisfied "the sufficiency standard for validation of [her] concerns."

Q. So as a part of your interviewing technique, wouldn't it have been a good idea to establish who the child was talking about when she was referring to "daddy"?

A. Yes.

Q. And you failed to do that correct; correct?

A. Yes.

The trial court later acknowledged that "she said and she did testify that she did not ask who daddy was, so let's just go on. I think you've established that." Mullin also testified, however, that G.J.R. was "sufficiently mature enough to know" the identity of her father. Nonetheless, Mullin did not assume that "daddy" referred to her biological father.

The uncertainties about the identification of "daddy" were confirmed by Mullin's supervisor, Bourgoyne, who reviewed the video-recording of Mullin's interview. Bourgoyne agreed that "it would have been appropriate" for Mullin to establish who G.J.R. was referring to as "daddy." After watching the tape, Bourgoyne agreed she could not identify S.H.R. as "daddy." She explained, "when [G.J.R.] made her statement, there was a lot of concern about what exactly she was talking about and that's why she [was] referred to the extended assessment." While Mullin testified that G.J.R. had the maturity to know who her mommy and daddy were, G.J.R.'s use of the term daddy when referring to the acts of a male at the Galveston fire shows at least some level of confusion and could not be disregarded by a reasonable factfinder, particularly in view of the concessions made by Mullin in cross-examination.

Based on Mullin's recommendation, G.J.R. and her two sisters underwent a more extensive forensic evaluation. In addition to her position as a supervisor for CAC's Forensic Services, Bourgoyne is a clinician and staff therapist with a specialization in child sexual abuse and was accepted by the trial court as an expert on forensic evaluation. The extended evaluation consisted of four sessions of behavior observation and assessment, an interview of G.J.R.'s former and current foster mothers, an interview with her child advocate, the preparation of a child behavior checklist, and a child sexual behavior inventory. The behavior observation sessions were conducted by Desiree Gallagher, who did not testify during the trial. Bourgoyne watched the video-recording of Mullin's interview but never talked with G.J.R. or her foster parents. She only read the report and "signed off on it."

Bourgoyne testified that several statements during G.J.R.'s interview "were concerning" about possible sexual abuse. She did not offer the opinion that S.H.R. had sexually abused G.J.R.[9] and conceded the G.J.R. had difficulty expressing herself during the interview. Bourgoyne explained that her concerns arose from G.J.R.'s statement about her mommy and

---

9. She denied that Mullin' interview shows that G.J.R. was sexually abused; "it says there are concerns about her sexual abuse." She further testified as follows:

Q. And if I were to tell you that your employee Ms. Mullin has testified earlier today that she was unable to say whether or not these children—this child in particular was sexually abused; would you dispute that?

A. No, I do not.

Later, in response to a question of whether she believed G.J.R. was sexually abused, she responded "there are a lot of *indicators* that sexual abuse was reported in this report." When further pressed, she explained that given her symptoms and statements, "the likelihood of sexual abuse is there." Bourgoyne did not identify the person who abused G.J.R. or explain whether the symptoms that were the basis for her statement were G.J.R.'s psychological problems or herpes.

daddy biting and licking her vagina and buttocks and eating Grandpa's "chilly." She was unable to recall whether Mullin's use of an anatomical doll was "consistent with established protocol for forensic interviews" but did not recall having any concerns about the methods used by Mullin during the interview. She admitted that investigations of suspected sexual abuse typically include offering to meet with the alleged perpetrator and that was not done here. Additionally, the evaluation was terminated prematurely because of G.J.R.'s display of distress during the portion of the session that involved "abuse-focused questioning." The report states, "[A]dditional attempts to complete the evaluation were not made."

Likewise, the extended evaluation report does not reach the conclusion that S.H.R. had sexually abused G.J.R. It noted that Mullin's interview was "highly suggestive of victimization or exposure," but it also noted that "overall" her statements during the interview were "unclear due to the combined and unclear details and timeframes." It stated that earlier investigations of alleged sexual abuse had been "Ruled Out" or categorized as "Unable to Determine." It discussed the herpes test results [10] but stated that they were unable to determine if the herpes "was contracted sexually." The report concluded that DFPS continued to have "concern regarding a likely history of abuse and neglect." It recommended additional evaluation and therapy.

As part of the forensic evaluation, the two oldest daughters were also interviewed by Wade–Zeller, a licensed professional counselor. Wade–Zeller testified that it was in the children's best interest that both biological parents' rights be terminated and that they remain in their current foster home. She did not base that recommendation on sexual abuse. Indeed, she admitted none of the girls told her anything about sexual abuse (although it is not clear that she asked about it) and that she had seen no evidence that S.H.R. had sexually abused any of the three children. [11]

Carly McGrew, a DFPS caseworker supervisor who met and talked on the telephone with S.H.R. concerning resources available to him and the possible source of the children's positive herpes test results, never asked S.H.R. whether he had sexual relations with the children. She testified that "it was the concern that the children would [suffer from] possible" emotional or physical abuse and "it's a concern" that the children "would be exposed to sexual abuse if they were returned to the father."

McGrew was the only witness who testified that the other two daughters may have been sexually abused. McGrew testified that there was evidence that the youngest child, C.N.R., was also sexually abused; the evidence was that "the siblings did make an outcry" that C.N.R. and "all of them" had been sexually abused. McGrew did not identify the acts of sexual abuse, the timing of the acts or the content of the statements. She testified that the outcry was made to an unidentified foster parent, though no foster parent testified at trial. McGrew did not speak directly with S.M.R. or G.J.R. nor is there any document evidencing any statement by either of them about abuse of G.J.R.'s siblings.

Rather than giving a definitive opinion, Lanicia McCray, a "specialist" with Child

---

**10.** At one point it states that all three children tested positive for herpes types one and two and at another point states that G.J.R. tested positive for herpes types one and two.

**11.** Wade–Zeller also testified that she had "been informed" of activity by G.J.R. that she described as inappropriate "sexual acting out" but did not describe the activity.

Protective Services, likewise expressed "concerns of possible sexual abuse." McCray acknowledged that she "signed off on" a December 8, 2008 treatment plan for G.J.R. from the foster care agency that contains the following progress update: "[G.J.R.'s] bio father has been cleared of any charges related to the sexual abuse of [G.J.R.] and her bio siblings." Nikki Golyer, the children's guardian ad litem, testified that she had never heard any of the children make any statements about being abused by their father during the therapy sessions she attended with the children. Her report states that three accusations of sexual abuse had been made against S.H.R. but they had "all been ruled 'Unable to Determine.'"

S.H.R. denied that he had ever engaged in any inappropriate conduct with his daughters. He implicated the "boyfriend" of the mother with whom she and the children lived in Galveston. S.H.R. testified that, while the mother and the children were living with the boyfriend, the boyfriend called him and said, "hey, I'm gonna touch your girls." When asked what the boyfriend's exact words were, S.H.R. testified, "I believe he said I'm gonna have sex with them." S.H.R. testified that he told the Galveston police about the threat but they refused to look into the issue, stating that the mother and her boyfriend were "just playing with your head" and that the police could not do anything about it without proof.

McGrew also testified about a conversation she had with S.H.R. in which he made similar allegations against the boyfriend. She testified the S.H.R. told her that he did not report his suspicions to law enforcement.

The psychiatrist who examined S.H.R. did not testify. The individuals who performed the follow-up forensic evaluations did not testify. The children's treating psychologist did not testify. The licensed counselor who was seeing the children did not ask questions about sexual abuse. These omissions highlight the lack of any firm conviction by any of the employees that a crime had occurred. No criminal charges were ever filed against SHR, nor was he ever interviewed by any police officers.

### c. Conclusion on sexual abuse evidence

I would hold that the evidence is legally sufficient to support a conclusion that children had oral herpes. But I agree with the Court that the evidence regarding genital herpes is not factually sufficient—considering the entire record, including both supporting and contradicting evidence, a factfinder reasonably could not have formed a firm conviction or belief that any of the children had genital herpes. *See In re J.O.A.*, 283 S.W.3d 336, 344–45 (Tex. 2009) (stating standard for legal sufficiency review); *Cervantes–Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 250 (Tex.App.-Houston [1st Dist.] 2006, no pet.) (stating standard for factual sufficiency review); *In re J.F.C.*, 96 S.W.3d at 266 (same). I also agree that the evidence was neither legally nor factually sufficient to support a determination that the children contracted herpes through sexual contact with S.H.R. I therefore concur with the Court's opinion that the trial court could not have relied on the herpes-related evidence to conclude that S.H.R. sexually abused his children.

Turning to the other sexual abuse evidence, I believe that this evidence was neither factually nor legally sufficient. While there was considerable evidence that a number of witnesses had "concerns" about the possibility of sexual abuse, the basis for such concern was frequently ambiguous and largely subject to interpreta-

tion—interpretation upon which qualified witnesses declined to opine—and the lack of follow-up on those concerns undermines the conviction of those who had them. The absence of certain relevant and available evidence from the record does not help matters. On the whole, the evidence put forth by DFPS relating to sexual abuse was not, when taken in context and in its totality, the "higher quality" of evidence necessary to satisfy the clear and convincing burden of proof. *See Sw. Bell Tel. v. Garza*, 164 S.W.3d 607, 625 (Tex. 2004); *Casso v. Brand*, 776 S.W.2d 551, 563 (Tex.1989).

## 2. Domestic violence, substance abuse, criminal activity and neglect evidence

The trial court could not have relied on sexual abuse in finding that S.H.R.'s parental rights should be terminated. But I believe that the evidence of domestic abuse, drug use, and neglect, accompanied by a criminal history relating to drug use and domestic violence, is legally and factually sufficient to support the trial court's termination finding.

### a. Domestic abuse

DHPS argues that evidence that the father "committed acts of domestic violence," abused "illegal drugs and alcohol," and committed "criminal acts before and after their births" provided sufficient proof of endangerment when considered in totality. Although it was not the focus of the trial, the evidence of domestic abuse supported the trial court's termination of S.H.R.'s rights.

A history of domestic violence by the father directed at the mother is evidence supportive of a finding of endangerment.

*In re J.O.A.*, 283 S.W.3d at 346. In that case, the trial court terminated the father's rights but the court of appeals found the evidence legally and factually insufficient. *Id.* at 339. The Texas Supreme Court held that the evidence was legally sufficient to support the termination of the father's parental rights but remanded to the trial court for a new trial based on the court of appeals' conclusion that the evidence was factually insufficient. *Id.* at 347. Part of the evidence that the court relied upon was the father's history of "two or three incidents of domestic violence." *Id.* at 346.[12]

We have previously held that evidence of abusive conduct toward a spouse is relevant in determining whether a course of conduct under subsection (E) has been established. *Jordan*, 325 S.W.3d at 724 (citing *In re D.T.*, 34 S.W.3d 625, 636–37 (Tex.App.-Fort Worth 2000, pet. denied); *see also In re D.C.*, No. 01–11–00387–CV, 2012 WL 682289, at *9–11 (Tex.App.-Houston [1st Dist.] March 1, 2012) (mother's testimony that father abused her physically and mentally when they were around each other supported parental termination under subsections (D) and (E)); *In re M.T.W.*, 2011 WL 6938542 at *5, *9, *13–14 (relying on evidence of domestic abuse to support parental termination under subsections (D) and (E)); *In re V.V.*, 349 S.W.3d 548, 556 (Tex.App.-Houston [1st Dist.] 2010, pet. denied) (stating in subsection (E) case that "Texas courts routinely consider evidence of parent-on-parent physical abuse in termination cases"); *Alanis v. Tex. Dep't of Protective & Regulatory Servs.*, No. 01–96–01022–CV, 1998 WL 608332, at *9 (Tex.App.-Houston [1st Dist.] Aug. 27, 1998, pet. denied) (mem. op.) (holding that evidence of abuse be-

---

**12.** The father also had a history of daily marijuana use. *In re J.O.A.*, 283 S.W.3d 336, 346

(Tex.2009).

tween mother and her partners supported finding under subsection (E), "even if the children were not always present"). We have also held that abusive and violent criminal conduct by a parent can produce an environment that endangers the well-being of a child. *Jordan*, 325 S.W.3d at 724. Evidence of past abusive conduct "permits an inference that the person will continue violent behavior in the future." *Id.*

Wade–Zeller testified that S.M.R. described "domestic violence" and "physical abuse" between the biological mother and father. Both S.M.R. and G.J.R. reported that they witnessed fighting, screaming and yelling between the mother and "daddy."[13] Unlike her younger sister, there was no evidence that S.M.R. referred to any adult male as "daddy" other than S.H.R., and there was no evidence that her use of the term "daddy" in her conversation with Wade–Zeller contained any ambiguity. Wade–Zeller testified the domestic violence S.M.R. recounted from when she was living with her mother and S.H.R. contributed to the children's psychological issues. When S.H.R.'s counsel raised the possibility that the children may have referred to more than one man as "daddy," Wade–Zeller acknowledged that she did not know if the mother had a boyfriend, did not get a specific name for the man referred to by either child as "daddy," and never explored the living arrangements between the mother and another man. While she admitted that she did not know if "daddy" was S.H.R., Wade–Zeller concluded her testimony by identifying S.H.R.

as the person who committed the abuse, in response to the following question: "[A]ll three of these children refer to the male you've been discussing in terms of domestic violence and so forth as 'daddy'?"

DFPS also relies on evidence of domestic violence as reflected in S.H.R.'s 2004 misdemeanor conviction for making a terrorist threat to the three children's mother.[14] In 2008, he was also convicted of interfering with an emergency call when he ripped the phone off the wall while the mother was using it during a "fight." It was disputed whether the children were present at the time of the incident; McGrew testified that the incident occurred while the mother was holding one of the children in her arms, which S.H.R. denied. S.H.R. admitted that he ripped the phone off the wall while the children were in the house but claimed they were asleep. The trial court could accept the testimony that one of the children witnessed the event. McCray testified that S.H.R.'s misdemeanor conviction of harassment also involved the children's mother.

In the Permanency Plan written approximately six months before trial, McCray reported that S.H.R. "was very abusive." No details are offered on this abuse. DFPS's exhibits also report that on three prior occasions CPS received referrals for physical abuse and once for "emotional/verbal abuse," but each was "ruled out."

Although not mentioned in their argument regarding the sufficiency of the evidence, DFPS's statement of facts notes

---

13. According to G.J.R., the abuse included "multiple occasions" when "daddy hit her mom."

14. DFPS also cites documents from the Newsom Psychological report that S.H.R. violated parole due to a charge of a domestic altercation with the mother of two other children who are older than the three children in this

case. This charge was later dismissed. The Child Advocates' report states that he was arrested for assault causing bodily injury in 1994, but that charge was also dismissed and no details are in the record. It is not clear whether that incident involved the mother of his two other children, or if it is the same incident.

that the mother's psychological evaluation by Newsom includes the following statement: "She stated that the children witnesse[d] their father being physically, verbally and sexually abusive to their [mother]." The court-appointed guardian ad litem's report, which was also admitted without objection, quotes this portion of the Newsom records.

### b. Alcohol and drug use

DFPS also relies on S.H.R.'s past use of illegal drugs and alcohol and his criminal record as proof of endangerment. A parent's use of narcotics may affect an ability to parent and therefore "qualify as an endangering course of conduct." *In re J.O.A.*, 283 S.W.3d at 345.[15] A long history of illegal drug use, when combined with other problems in a parent's life, is evidence supporting a finding of an endangering course of conduct by a parent. *In the Interest of N.D.B.*, No. 07–11–00140–CV, 2011 WL 5966203, at *4–5 (Tex.App.-Amarillo Nov.29, 2011, no pet.) (mem. op.).

This Court has also relied on drug usage to support a finding of termination under subsection (E). *See e.g., Toliver v. Tex. Dep't of Family & Protective Servs.*, 217 S.W.3d 85, 98 (Tex.App.-Houston [1st Dist.] 2006, no pet.) ("Evidence of narcotics use and its effect on a parent's life and her ability to parent may establish that the parent has engaged in an 'endangering course of conduct.' "); *Vasquez v. Tex. Dep't of Protective & Regulatory Servs.*, 190 S.W.3d 189, 195–96 (Tex.App.-Houston [1st Dist.] 2005, pet. denied) (terminating parental rights despite there being no direct evidence of parent's continued drug use actually injuring child). "Because it exposes the child to the possibility that the parent may be impaired or imprisoned, illegal drug use may support termination under section 161.001(1)(E)." *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex.App.-Houston [1st Dist.] 2009, pet. denied). In *Walker*, we concluded that the father's current use of cocaine and marijuana and arrest for delivery of drugs supported the trial court's finding that the father engaged in a deliberate course of conduct that endangered his child under subsection (E). *Id.* at 618.

After the trial court signed an order giving DFPS temporary conservatorship of the children under Chapter 262 of the Family Code, DFPS enacted a plan for S.H.R. to demonstrate his suitability for custody of the children. S.H.R. admitted that he knew it was his responsibility to complete the tasks outlined in the plan. McGrew oversaw S.H.R.'s response to the plan. She testified that S.H.R. had a history of drug abuse, which was "part of the reasons for removal." Before the children were born, S.H.R. was convicted in 1992 of

---

**15.** In *J.O.A.*, the father missed at least two drug screenings and admitted that he had used marijuana on a daily basis. *See In re J.O.A.*, 283 S.W.3d at 345. The father had also passed three drug tests, and there was no evidence of continued drug usage. *Id.* Nevertheless, the Court found this evidence supported the trial court's termination order. *Id.* at 346.

The Court cited with approval *In re S.N.*, 272 S.W.3d 45, 52 (Tex.App.-Waco 2008, no pet.) ("Evidence of illegal drug use or alcohol abuse by a parent is often cited as conduct which will support an affirmative finding that the parent has engaged in a course of conduct which has the effect of endangering the child."); *In re R.W.*, 129 S.W.3d 732, 739 (Tex.App.-Fort Worth 2004, pet. denied) ("As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child. Drug use and its effect on a parent's life and his ability to parent may establish an endangering course of conduct.") (citation omitted).

possession with intent to deliver cocaine.[16] According to the Newsom Psychological records, he underwent substance abuse treatment in 1997, after his arrest. During his "substance abuse assessment" at Newsom Psychological, S.H.R. admitted to using marijuana six months earlier. During trial, S.H.R. also admitted to using marijuana "maybe about two, three years ago," which would have been after the birth of S.M.R. He also admitted to using cocaine "more than five years" ago. The Newsom Psychological records reflect a diagnosis of cannabis abuse "in subjective remission" and "cocaine abuse in remission." It summarizes the significance of this use:

> [S.H.R.] probably has more substance abuse problems than he admits.... However, the other noted issues, such as assault and terrorist threats are frequently associated with substance abuse, as are other issues, such as poor judgment in terms of relationships and problems meeting responsibilities. Because of his past treatment and his denial, it is doubtful that substance abuse treatment would have much of a positive effect on [him.]

According to McGrew, S.H.R. also "has problems with alcohol." The extent of his problem was shown by (1) a notation in his Newsom Psychological records that he attended AA in 1997, (2) a notation in the same records that he "admits using alcohol frequently," (3) a statement by the mother to McCray that S.H.R. "drinks a lot" and that "she's worried about him with the kids," (4) a diagnosis in his Newsom Psychological records of alcohol abuse "in sub-jective remission," (5) a notation in the mother's Newsom Psychological records that S.H.R., while in temporary custody of the children for a month during a separation, "was abusing drugs and alcohol,"[17] and (6) his 1997 conviction for driving while intoxicated, for which he served six months and paid a fine. At the time of the trial, he was still on the first step of the twelve-step AA program in which DFPS had ordered him to participate over a year earlier and also had not obtained a sponsor.

S.H.R. also has a long criminal record that consisted of two convictions before any of the children were born and four misdemeanor convictions after the oldest child was born. After S.M.R. was born, he was convicted for making a terrorist threat against the children's mother in October 2004,[18] interfering with an emergency call in January 2008,[19] criminal trespassing at his girlfriend's home after they had broken up in December 2008,[20] and harassment in March 2009.[21] He also testified that he served two weeks in jail related to a traffic offense. Mere imprisonment, standing alone, will not constitute engaging in endangering conduct. But that does not mean imprisonment is not relevant; it may be considered in determining whether all the evidence shows a course of conduct that has the effect of endangering the child's physical or emotional well-being. *Alanis*, 1998 WL 608332, at *9 n. 23; *see also In Interest of B.R.*, 950 S.W.2d 113, 119 (Tex.App.-El Paso 1997, no writ), *disapproved of in part by In re J.F.C.*, 96 S.W.3d 256 (Tex.2002) ("Evidence of a par-

---

**16.** He was sentenced to seven years but only served one.

**17.** No details on this incident were developed in the evidence.

**18.** He served one day.

**19.** He was fined $300 and served two days.

**20.** He was sentenced to eighteen days and fined.

**21.** He was sentenced to eleven days.

ent's imprisonment may contribute to a finding that the parent engaged in a course of conduct which endangered a child's physical or emotional well-being."); *In re V.V.*, 349 S.W.3d at 557 (holding evidence of incarceration, abuse of mother, and failure to contact or support children sufficient to support parental termination); *see also In re D.C.*, 2012 WL 682289, at *9—(finding that combination of father's domestic abuse of mother, criminal convictions leading to deportation, and failure to remain in contact with children supported termination).

### c. Neglect

DFPS also contends that S.H.R.'s frequent moves "without adequate support" support a finding of endangerment. There is evidence that S.H.R., who lived with the children's mother for about four years, moved approximately once a year at the mother's request and did not have adequate housing.

The record regarding S.H.R.'s ability to financially support the family was mixed, but was legally sufficient when we disregard, as we must, the contrary evidence. S.H.R.'s records from Newsom Psychological, dated January 13, 2010, state that he was unable "to maintain stable housing." These records reflect that, at that time, S.H.R. had been living in a mobile home for the past eighteen months with his girlfriend and her eight year old son, who was autistic.

The caseworker, McGrew, testified that S.H.R. never presented documentary proof that he was employed. He reported to her that he was working for his brother doing remodeling. He lost an earlier job when he was accused of theft—which he denied—and lost another job cleaning air-

planes when he lost his security badge. According to the children's mother's interview with Newsom Psychological, she did not work outside the home while living with S.H.R. because he supported the family. S.H.R. testified that he did not provide documentary proof of employment because he was paid in cash, but the trial court could have found his testimony not credible.

There was other evidence of neglect. McCray stated that DFPS initially removed the children on the basis of neglectful supervision and medical neglect—the girls were underweight and had scabies and G.J.R. had a sprained ankle. The family service plan and a report by Newsom Psychological [22] stated that DFPS received a referral from the children's maternal aunt while their mother went to school and S.H.R. was incarcerated. The aunt reported to DFPS that the parents "neglected to provide her with any documents to properly care for the children. The children were sick and [the aunt] did not have the Medicaid information to take the children to the doctor." S.H.R. testified that he had the children for three months in late 2008, but left the children with their aunt because he turned himself in on an arrest warrant for an inspection or registration sticker. According to S.H.R., he voluntarily went to the jail in order to pay a fine and remained there for two weeks. He did not dispute the statement that he failed to provide the aunt with medical records or the necessary Medicaid information. He admits that upon his release he did not go looking for his children because the aunt had moved. McGrew, a caseworker, testified that when the children first came into CPS's custody

---

**22.** S.H.R. was evaluated by Dr. Ross Keiser with Newsom Psychological on January 12, 2010. The mother was seen at Newsom in August 2009 but did not complete her evaluation

they could not locate S.H.R. They were unable to contact him for several weeks. This is further evidence of neglect.

The trial court's endangerment finding is also supported by S.H.R.'s failure to do anything further than have one conversation with the police about the purported threat of sexual abuse of the children he attributed to the mother's boyfriend. If the trial court found the father's claim credible, it could have concluded that he knowingly allowing the children to remain with the boyfriend, who engaged in conduct that endangered their physical or emotional well-being. *See In re Tidwell,* 35 S.W.3d 115, 119–20 (Tex.App.-Texarkana 2000, no pet.) ("[I]t is not necessary for [the mother] to have had certain knowledge that one of the [sexual molestation] offenses actually occurred; it is sufficient that she was aware of the potential for danger to the children and disregarded that risk by ... leaving the children in that environment."). According to his own testimony, S.H.R. knew that the boyfriend was going to sexually abuse the children. While he claimed to have notified the police, he did not notify DFPS, pursue his complaints with the police, or bring any action to terminate the mother's rights. The omission in itself entitled the trial court to find that he allowed the children to remain in an environment that endangered them. *See Jordan,* 325 S.W.3d at 722 (holding evidence sufficient to support termination under subsection (D) based in part on mother allowing children to remain with violent and abusive father).

### d. Conclusion on domestic violence, substance abuse, criminal activity and neglect

Although it was not the focus of DFPS's case, I believe the evidence of domestic violence between S.H.R. and the children's mother, S.H.R.'s drug and alcohol abuse,

the criminal record attendant to these activities, and S.H.R.'s failure to ensure a stable and healthy home environment for the children is, when taken together, both legally and factually sufficient to support the trial court's finding of endangerment under Family Code section 161.001(1)(E). *See, e.g., J.O.A.,* 283 S.W.3d at 346 (finding evidence legally sufficient to support determination of endangerment based on "a history of domestic violence" and admitted use of marijuana); *In re M.R.,* 243 S.W.3d 807, 819 (Tex.App.-Fort Worth 2007, no pet.) (holding that father's imprisonment, along with drug use, criminal conduct, and allowing child to live with known drug users, constitutes endangerment); *In re J.T.G.,* 121 S.W.3d 117, 131 (Tex.App.-Fort Worth 2003, no pet.) (holding father's incarceration before and during pregnancy, coupled with drug and alcohol abuse, sufficient to support finding of endangerment); *Robinson v. Tex. Dep't of Protective and Regulatory Servs.,* 89 S.W.3d 679, 686–87 (Tex.App.-Houston [1st Dist.] 2002, no pet.) (holding that mother's imprisonment and drug use in violation of community supervision constitutes endangerment); *In re S.D.,* 980 S.W.2d 758, 763 (Tex.App.-San Antonio 1998, pet. denied) (holding that parents' imprisonment, in addition to drug use and continuous criminal activity, is sufficient to support finding of endangerment); *see also Padilla v. Tex. Dep't of Family & Protective Servs.,* No. 01–07–00313–CV, 2008 WL 525750, at *1–2 (Tex. App.-Houston [1st Dist.] Feb. 28, 2008, no pet.) (mem. op.).

Viewing the evidence of domestic violence—resulting in convictions and, ultimately, imprisonment—and drug and alcohol abuse, along with evidence of neglect of the children, in the light most favorable to the verdict, I believe the trial court could reasonably have formed a firm belief or conviction that S.H.R. engaged in a course of conduct and placed or allowed the chil-

dren to remain in conditions that endangered their physical or emotional well-being. Also, considering the entire record, including both evidence supporting and evidence contradicting the finding, the trial court could have formed a firm conviction or belief that S.H.R. engaged in a course of conduct and placed or allowed the children to remain in conditions that endangered their physical or emotional well-being.

Accordingly, I would overrule S.H.R.'s first and second issues on appeal.

### B. Best interest

I agree with the Court's conclusion that the evidence is legally sufficient to support the trial court's best interest finding and would further find that the evidence is factually sufficient to support this finding. Much of the evidence supporting the trial court's finding that S.H.R. engaged in or knowingly placed the children with others who engaged in conduct which endangered their physical or emotional well-being also supports the trial court's best interest finding.

In determining whether the termination of appellant's parental rights was in the children's best interest, we may consider several factors, including

(1) the children's desires,

(2) the current and future physical and emotional needs of the children,

(3) the current and future physical danger to the children,

(4) the parental abilities of the person seeking custody,

(5) whether programs are available to assist the person seeking custody in promoting the best interests of the children,

(6) plans for the children by the person seeking custody,

(7) the stability of the home,

(8) acts or omissions of the parent that may indicate that the parent-child relationship is not proper, and

(9) any excuse for acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex.1976); *In re L.M.*, 104 S.W.3d 642, 647 (Tex.App.-Houston [1st Dist.] 2003, no pet.).

The *Holley* factors are not exhaustive, and there is no requirement that DFPS prove all factors as a condition precedent to parental termination. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex.2002). The best-interest standard does not permit termination merely because a child might be better off living elsewhere. *In re D.M.*, 58 S.W.3d 801, 814 (Tex.App.-Fort Worth 2001, no pet.).

### 1. Desires of the child

At the time of trial, the children were four, five, and six years old and did not testify or speak directly to the trial court. Wade–Zeller, however, testified that the children had started to form a bond with their foster parent and expressed a desire to stay with her and be adopted by her. She testified that "with all the changes that consistently happened with each time that they've been moved and abandoned" the children had "just now started to kind of move forward and become stable, and any kind of change in that will cause them to regress back." Additionally, the children displayed evidence of behavioral problems when they learned that they might have to change households. McGrew also testified that the children desired to remain with their foster parent.

### 2. The children's current and future emotional and physical needs

S.H.R.'s children have exceptional needs that underscore the importance of a stable home environment so they can receive

long-term care. Not only are they suffering from some form of herpes, they are also suffering psychologically. Wade–Zeller, a licensed professional counselor, testified without any rebuttal that it was in the best interest of the children that both biological parents' rights be terminated and recommended that the girls remain in their current foster home. She testified that, "in order to continue to try and improve and not have reactive attachment disorder[,] they need a stable home so that they're not being dropped off with relatives." McGrew also testified that, in her opinion, it was in the children's best interest that the biological parents' rights be terminated so that the children could be adopted or, if not adopted, left in the custody of DFPS. She testified that she had seen an improvement in the children's health, care, and safety after being removed from the biological parents' care.

In her testimony, Wade–Zeller identified a number of psychological problems the children were experiencing. She diagnosed the two oldest daughters, S.M.R. and G.J.R, as suffering from "reactive attachment disorder." She testified that all three children exhibit depressive symptoms and have been prescribed anti-depression medications. Both S.M.R., who was six at the time of trial, and C.N.R., who was four, are taking Prozac, while G.J.R. is taking several different medications. The children suffered separation anxiety because they had to live with their aunt for several months when their father was serving time for a misdemeanor.

Wade–Zeller testified that S.M.R. had "symptoms of anxiety," "problems interacting with other children," and "problems being left at other places." She was afraid to be left alone without her foster mother. Her symptoms were "consistent with reactive attachment disorder." She described "fighting" between her parents and "screaming and yelling." She described fear that she would get in trouble with her parents. S.M.R. had to be hospitalized on three occasions for psychiatric care. On one such occasion, she was hospitalized while living with a foster mother because she "couldn't get her under control, and the foster mom felt like she was going to hurt herself." They have "special needs."

Wade–Zeller testified that G.J.R. exhibited symptoms consistent with post-traumatic stress disorder, suffered from nightmares, and had trouble interacting with other children. According to the Extended Forensic Evaluation summary of discussions with the current foster mother, G.J.R. is moody, needy, whiney, angry, violent toward her sisters and foster mother, fascinated with fire and knives, and "displayed sexualized behaviors such as pulling her pants down [and] rubbing herself on a doll." She is also withdrawn and defiant, and has shown symptoms of increased aggressiveness and depression. She is "extremely anxious" around males. The foster mother also reported that she had once seen G.J.R. put her legs in the air and say to her older sister, "Let's act like mommies and daddies do." Wade–Zeller also testified that G.J.R. told her of activity that she described as inappropriate "sexual acting out." When told that she and her sisters would be moving, she began to complain of leg pain. The current foster mother also reported that G.J.R. "was being treated for Oppositional Defiant Disorder and Attention Deficit/Hyperactivity Disorder by a psychiatrist at Depelchin."

The youngest child, C.N.R., takes Prozac and Reiperidone daily and has been diagnosed with impulsive control disorder.

In sum, these children have special needs. But there was no evidence that the father had exhibited a desire or ability to

meet these needs in the past or intended to do so in the future.

### 3. Dangers to the children, now and in the future

Wade–Zeller testified that an environment in which the parents fight and yell at each other is not proper for children of this age and it was not in their best interest to return to such an environment. She further testified that it was "likely possible" that the children's psychological problems resulted in part from witnessing such events. According to Wade–Zeller "the physical abuse that was witnessed between the parents" will cause the children continuing harm in the future. McGrew also testified that it was her opinion that there would be emotional and physical danger to all three children if they were returned to either their mother's or their father's care.

S.H.R. has engaged in risky behaviors. He has a history of drug and alcohol abuse. Certainly a parent's long history of illegal drug usage does not create a positive environment for the children. S.H.R.'s drug usage is a factor that may be considered in a best interest analysis. *See* TEX. FAM.CODE ANN. § 263.307(b)(8) (West 2008) (best interest inquiry includes "whether there is a history of substance abuse by the child's family or others who have access to the child's home"). His unwillingness to acknowledge his alcohol problem is another indication that termination is in the children's best interest. *See* TEX. FAM.CODE ANN. § 263.307(b)(11) (West 2008) (best interest inquiry includes whether parent demonstrates "the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time").

S.H.R.'s criminal record is also evidence that the court may have considered in determining the children's best interest. Whenever he was in jail, he could not fulfill his parental responsibilities. And he was in jail on enough occasions—though the only ones after the oldest daughter's birth were all misdemeanors—that the court could have determined that not only was he unavailable to care for his children, but he was a poor model for them.

Additionally, while the evidence was not factually sufficient to demonstrate that the children suffered from genital herpes or that the disease was sexually transmitted, it was undisputed that two of the children suffered from oral herpes.

Finally, the confusion over the identity of "daddy" is significant. There was some evidence that S.M.R. referred to a man with whom she and her mother and sisters had lived in Galveston as "daddy" when discussing a fire at that home. This created some ambiguity as to whom S.M.R. was referring as "daddy"—her biological father or the "boyfriend"—in her statements that raised concerns about possible abuse. S.H.R. testified that the boyfriend had called him and threatened to sexually abuse his children. Although S.H.R. stated that he contacted the police about the threat, the trial court could have discredited this testimony in light of McGrew's testimony that S.H.R. told her that he did not report the incident to law enforcement. *See In re L.M.I.*, 119 S.W.3d 707, 712 (Tex.2003). Even if the trial court credited S.H.R.'s testimony that he reported his suspicions to the police, S.H.R.'s failure to take any further action to protect his children from perceived sexual abuse by the man with whom they were living might have caused the trial court to question S.H.R.'s parenting skills, including his ability to meet children's needs and to protect them from danger now and in the future. *See Holley,* 544 S.W.2d at 372. Moreover, assuming that S.M.R. referred to the boyfriend as her "daddy," the reference indicates a lack of closeness with S.H.R. And

even if neither man sexually abused S.M.R., her statements and inappropriate sexual behavior and sexual comments suggest, at a minimum, that she was exposed to sexual conduct between her parents.

This evidence weighs in favor of the trial court's best-interest finding.

### 4. Parental abilities and available programs

Closely related to the parent's abilities and the availability of programs of assistance are (1) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision and (2) whether an adequate social support system consisting of an extended family and friends is available to the child. TEX. FAM.CODE ANN. § 263.307(b).

"Evidence of past misconduct or neglect can be used to measure a parent's future conduct." *In re D.M.*, 2012 WL 149230, at *6. S.H.R. has shown a willingness and ability to accept an appropriate agency's assistance in some respects, but has failed in others. He failed to complete his treatment for alcohol abuse. He refused to concede that he has an alcohol problem. He did not provide proof that he had completed an anger management program until the day of trial. S.H.R.'s family service plan required him to complete four sessions of psychological therapy, but he did not. He participated in one required psychological assessment, but the evidence indicates that he was not entirely candid with the psychologist retained by DFPS. And when the assessment resulted in recommendations for therapy, parent education, vocational counseling, stress management, and substance abuse treatment, he did not complete the recommended treatments.

Even for the classes he did complete, this evidence of a recent improvement does not absolve a parent of a history of irresponsible choices. *See In re D.M.*, 2012 WL 149230, at *7 (recent improvement does not absolve a parent of a history of irresponsible choices); *see also Smith v. Tex. Dep't Prot. & Reg. Servs.*, 160 S.W.3d 673, 681 (Tex.App.-Austin 2005, no pet.) (same). S.H.R.'s testimony regarding his inability to locate his children because their maternal aunt moved and he did not know where to find them is further evidence in support of this factor.

There is also evidence that S.H.R. did not cooperate with DFPS while his children were in its care and that he failed to provide the necessary medical records to the aunt. Finally, there is no evidence of any support system from family or friends to assist S.H.R. with providing for the children's special needs. There was testimony, on the other hand, that DFPS did have programs available to assist any foster or adoptive parent in meeting the children's needs.

### 5. Plans for children and stability of the home

The children have lived a life of instability, including a voluntary out-of-home placement by S.H.R. with the children's maternal aunt. The children moved on a yearly-basis. After the parents last separated in approximately 2007 or 2008, they lived with their mother and there was no evidence showing how often the father spent time with the children during the intervening two to three years before the trial of this case.

There was also evidence that the father was unable to adequately provide for his children, another factor relevant to determining the children's best interest. *See In re D.M.*, 2012 WL 149230, at *6 (concluding that legally and factually sufficient evidence supported termination under sub-

section (E) in part based on father's "instability" and "six-months' disappearance during the case"); *In re H.N.H.*, 2012 WL 117861, at \*25 (evidence of unstable work history and frequent moves supported conclusion that the mother's "conduct, including omissions, endangered her children's physical or emotional well-being and that [the m]other exposed her children to an unstable environment that endangered her children's physical or emotional well-being"); *see also In re T.C.*, No. 10–10–00207–CV, 2010 WL 4983512, at \*4–5 (Tex. App.-Waco Dec. 1, 2010, pet. denied) (mem. op.) (holding that although there were recent developments that showed improvements in mother's stability, the trial court could reasonably have determined that any evidence of improvement was short-lived and outweighed by the extent of her prior history; thus, the evidence supported that mother, by living in fifteen locations among other things, had engaged in conduct that endangered the child's physical and emotional well-being); *In re Z.A.S.*, No. 02–11–00040–CV, 2011 WL 3795231, at \*15–16 (Tex.App.-Fort Worth Aug. 25, 2011, no pet.) (mem. op.) (holding evidence legally sufficient to support trial court's 161.001(1)(D) and (E) findings because evidence showed that mother, among other things, had moved frequently and had limited employment); *In re J.G.K.*, No. 02–10–00188–CV, 2011 WL 2518800, at \*39–41 (Tex.App.-Fort Worth June 23, 2011, no pet.) (mem. op.) (holding evidence legally sufficient to support trial court's (D) and (E) findings because evidence showed that mother, among other things, failed to seek medical treatment for child, moved frequently, had limited employment, and exposed her children to domestic violence); *In re T.H.*, No. 02–07–00464–CV, 2008 WL 4831374, at \*4–5 (Tex. App.-Fort Worth Nov. 6, 2008, no pet.) (mem. op.) (holding evidence legally sufficient to support trial court's (D) and (E)

findings because evidence showed that father had engaged in conduct that subjected his children to life of instability and uncertainty, including living at more than five residences over five years; using illegal drugs; engaging in domestic violence; and exhibiting anger issues). Although S.H.R. claimed he was employed at the time of trial, the trial court could have discounted this testimony, given that he failed to provide his case worker with proof of employment. He lived in his girlfriend's mobile home with her autistic child and admitted that the home needed repairs because of hurricane damage.

The trial court could have also concluded that S.H.R.'s home environment lacked stability. S.H.R. admitted that he "called CPS in December of 2008 to tell them that [he] wouldn't be able to take care of the kids that [he] had in [his] possession at that time … because [he] had broken up with [his] girlfriend." He never offered any explanation for how he could care for the children if they broke up again.

The trial court, as the finder of fact, was free to consider S.H.R.'s history of instability in determining the likely future for these children. *See In re B.S.W.*, No. 14–04–00496–CV, 2004 WL 2964015, at \*9 (Tex.App.-Houston [14th Dist.] Dec. 23, 2004, no pet.) (mem. op.) ("Ms. Woods has failed to show that she is stable enough to parent B.S.W. for any prolonged period. The trial court was entitled to determine that this pattern would likely continue and that permanency could only be achieved through termination and adoption."). The trial court could have concluded from this evidence that S.H.R. lacked the willingness or ability to provide for the children's futures and that S.H.R. could not offer a permanent and stable solution for the three children at the time of trial. A parent who lacks stability, income, and a home is unable to provide for a child's

emotional and physical needs. *In the Interest of J.T.G.*, No. 14–10–00972–CV (Tex. App.-Houston [14th Dist.] January 19, 2012); *White*, 2005 WL 174546, at *8.

Finally, S.H.R. offered no evidence regarding any plans for the children. Despite their significant psychological and medical needs, S.H.R. did not testify or otherwise attempt to show that he had given thought to how he would provide for the children's needs if he was given custody of the children.

This evidence weighs in favor of the best-interest finding.

### 6. Acts or omissions and any excuses for them

There was also evidence of acts or omissions by S.H.R. that indicated the existing parent-child relationship is not a proper one. First, there is a history of CPS involvement with the family before DFPS took custody of the children. *See In re M.T.W.*, 2011 WL 6938542, at *36 (considering such evidence in determining best interest of children). Second, there is a history of S.H.R. being absent from the children's lives for meaningful periods of time before DFPS took custody of the children. While S.H.R. contended that the reason he did not go back to look for his children after being released from jail was that the aunt who was caring for them had moved, the trial court could have determined the S.H.R. should have made more of an effort to locate his children. Third, there is the evidence of domestic violence and drug usage discussed above. The record does not contain evidence that would excuse these behavioral patterns or indicate that they will not continue in the future.

### 7. Conclusion on best interest

Considering all the evidence in relation to the *Holley* factors in the light most favorable to the trial court's finding, a reasonable trier of fact could have formed a firm belief or conviction that termination was in the children's best interest. *J.F.C.*, 96 S.W.3d at 266. And viewing all the evidence in a neutral light in relation to the *Holley* factors, the trial court could have reasonably formed a firm belief or conviction that termination was in the children's best interest. Accordingly, I agree that the evidence is legally sufficient on the best-interest finding and would hold that the evidence is factually sufficient as well.

### Conclusion

DFPS spent a great deal of time and effort trying to prove their contention that S.H.R.'s parental rights should be terminated because he sexually abused his children and sexually transmitted herpes to them. The legal and factual insufficiency of these two allegations is, in part, a reflection of the elevated standard of proof required in parental termination cases— clear and convincing evidence. That standard is an "error-reducing" standard. *Santosky v. Kramer*, 455 U.S. 745, 761, 102 S.Ct. 1388, 1398, 71 L.Ed.2d 599 (1982). Certainly DFPS raised a great deal of suspicion about sexual abuse. But suspicions and speculation are not evidence. Nor is innuendo, even when offered in large quantities, a substitute for factual evidence. Therefore, the evidence is legally and factually insufficient to support a determination of sexual abuse.

Nevertheless, I believe the evidence was legally and factually sufficient evidence to support the trial court's conclusion that S.H.R.'s parental rights should be terminated under section 161.001(1)(D) and (E). This evidence supports a conclusion that S.H.R. abused his wife in front of the children, had a history of drug and alcohol abuse that was likely to continue in light of his knowing failure to comply with the

DFPS plan and denial of any substance abuse problem, had a history of imprisonment, and exhibited periods of absenteeism and neglect. I therefore respectfully dissent.

## SUPPLEMENTAL OPINION ON REHEARING

PER CURIAM.

DFPS filed a motion for rehearing in which it contends that this Court should not have reversed the portion of the final order of termination affecting the appointment of DFPS as sole managing conservator of the children. DFPS requested conservatorship pursuant to Family Code section 153.131, and the trial court made the specific findings in its final order. TEX. FAM.CODE ANN. § 153.131 (West 2008); *see also In re J.A.J.,* 243 S.W.3d 611, 615 (Tex.2007). Appellant concedes on rehearing that he did not independently challenge the portion of the order concerning conservatorship, and appellant does not oppose the motion for rehearing. *See In re J.A.J.,* 243 S.W.3d at 616–17.

Accordingly, we grant the motion, rehear the case, set aside our April 20, 2012 judgment, and render judgment reversing the portion of the trial court's final order ·of termination affecting appellant's parental rights and remanding the case to the trial court for further proceedings. If a new trial is held, the Court instructs the trial court to commence trial no later than 180 days after the mandate is issued. *See* TEX.R.APP. P. 28.4(c). As this is an unopposed motion for rehearing, we instruct the Clerk to issue the mandate with our new judgment. *See* TEX.R.APP. P. 18.6. Our opinions issued on April 20, 2012 remain unchanged.